**Hunter FAULCONER, Sr. and Mary T. Faulconer, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 83–2014.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1984.

Decided Nov. 20, 1984.

V.R. Shackelford, Jr., Orange, Va. (Shackelford & Robertson, Orange, Va., Thomas A. Davis, Davis & McLeod, Washington, D.C., on brief), for appellants.

Jo-Ann Horn, Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WIDENER and HALL, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

WIDENER, Circuit Judge:

Hunter and Mary Faulconer (taxpayers) appeal the judgment of the Tax Court, 1983 T.C.M. (P–H) ¶ 83,165, which disallowed certain tax deductions and credits attributable to their farming activity on the ground that this activity was not engaged in for profit. The Tax Court thus found deficiencies in income taxes due from the taxpayers in the aggregate amount of $60,635.49 for the years 1970, 1972, 1973, and 1975. We reverse.

I

Hunter Faulconer, age 75 at the time of the Tax Court hearing, has operated two farms in Albemarle County, Virginia, since 1950. From the age of 9 he grew up on one of the farms and operated the same as his father's executor during 1947–50. For all the time since 1950, he has actively engaged in horse breeding, racing, and selling, as well as cattle raising and selling (collectively referred to as the farming ac-

tivity [1]) on these farms. Mary Faulconer is a party to this action solely because she filed tax returns jointly with Hunter Faulconer, her husband. The taxpayers incurred a net loss in their farming activity in five out of the seven tax years 1970 to 1976, and realized a net profit in two of those seven years, specifically, 1971 and 1975. A summary of the income and expenses of this farming activity follows: [2]

| | Income | Expenses and Depreciation | Net Profit or (loss) |
|---|---|---|---|
| 1970 | $ 56,842.32 | $ 99,856.37 | $(43,014.05) |
| 1971 | 110,084.84 | 95,803.00 | 14,281.84 |
| 1972 | 59,462.40 | 81,678.00 | (22,215.60) |
| 1973 | 75,112.20 | 96,015.00 | (20,902.80) |
| 1974 | 106,462.70 | 119,629.00 | (13,166.30) |
| 1975 | 115,804.00 | 112,644.00 | 3,160.00 |
| 1976 | 60,992.00 | 82,282.00 | (21,290.00) |

The details of the farming activity and the gains and losses therefrom are referred to with more particularity below.

After an audit of the taxpayers' returns, the IRS determined that taxpayers' farming activity was not engaged in for profit under the standards of I.R.C. § 183,[3] a determination that had several tax consequences. The IRS disallowed deduction of the net farm losses from the taxpayers' other income, see I.R.C. § 183(a)–(b); disallowed an investment credit; disallowed farm-fuel credits under I.R.C. §§ 39, 6420; and assessed against the taxpayers additional self-employment tax. The taxpayers challenged this determination in the Tax Court, and claimed further that they were entitled to an additional refund of $1,144 because their loss in 1972 was greater than they had originally calculated. *See supra* note 2. The Tax Court rejected the taxpayers' claims, finding that the farming activity was not engaged in for profit.

## II

A survey of the statutory and regulatory framework is in order, particularly because the Tax Court focused exclusively on the issue of profit motive under the so-called hobby-loss provision, I.R.C. § 183, and failed to mention the inseparable issue of whether the taxpayers' farming activity was a trade or business.

■ Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a "trade or business" under I.R.C. § 162(a). We have required that a business be undertaken "in good faith for the purpose of making a profit" in order for its expenses to be deductible under I.R.C. § 162. *Malmstedt v. Commissioner*, 578 F.2d 520, 527 (4th Cir. 1978); *Cecil v. Commissioner*, 100 F.2d 896, 899 (4th Cir.1939). Particularly relevant to this case is the regulation under section 162 that allows a farmer who operates a farm "for profit" to deduct as necessary expenses all amounts actually expended in the carrying on of the business of farming. 26 C.F.R. § 1.162–12(a).

Related to section 162 is I.R.C. § 212, which generally allows an individual to deduct ordinary and necessary expenses paid or incurred in profit seeking activities that do not rise to the level of a "trade or business." [4] If an individual incurs a loss

---

1. The parties stipulated that the two farms were used together as a "single farming enterprise."

2. The taxpayers' original returns showed different figures, resulting in three profit years and four loss years from 1970 to 1976 for the farming activity. After the taxpayers filed their petition, it was discovered that taxpayers had been reporting earnings at the race track in the year the track actually made payments to Faulconer *rather than in the year the earnings were earned and deposited to Faulconer's account at the track.* The taxpayers and the IRS thereafter stipulated to the figures derived when track income is included in the tax year in which the income was earned and credited to Faulconer's account at the track. *It is these figures that are summarized.*

3. All Internal Revenue Code (IRC) sections correspond to 26 U.S.C. § ——.

4. Section 212 permits deductions for such expenses incurred "for the production or collection of income," "for the management, conservation, or maintenance of property held for the production of income," or "in connection with the determination, collection, or refund of any tax." The regulations under section 212 seem to allow a limited exception to the profit-motive requirement. Expenses of managing, conserving, or maintaining property held for investment "may be deductible under section 212 even though the property is not currently productive *and there is no likelihood that the property will be sold at a profit or will otherwise be produc-*

in a trade or business, or in any transaction entered into for profit unconnected with a trade or business, I.R.C. § 165(c) permits the individual to deduct the loss.

Congress supplemented these provisions in the Tax Reform Act of 1969, Pub.L. No. 91–172, § 213(a), 83 Stat. 487, 571–72, by enacting I.R.C. § 183 out of concern about the ineffectiveness of a prior provision [5] in reaching taxpayers who were not carrying on a business to realize a profit but who were merely attempting to utilize losses from an operation to offset other income. H.R.Rep. No. 413, 91st Cong., 1st Sess., Leg.Hist., U.S.Code Cong. & Admin.News 1969, pp. 1645, 1717; S.Rep. No. 552, 91st Cong., 1st Sess., Leg.Hist. at 2027, 2133.

■ Section 183 generally allows deductions only to the extent of gross income in an activity "not engaged in for profit." [6] This provision plainly defines an activity not engaged in for profit as an activity other than one with respect to which deductions are allowable under sections 162 and 212(1) and (2). I.R.C. § 183(c). Section 183, therefore, does not come into play unless there has been a determination that an activity is not a trade or business under section 162 or not actively related to the production or collection of income under section 212. *See Brannen v. Commissioner*, 722 F.2d 695, 704 (11th Cir.1984).

In the legislative history of the Tax Reform Act of 1976, the committee reports explain that "the rules for determining whether an activity is a trade or business or engaged in for the production of income are the same as those used for determining whether an activity is engaged in for profit (i.e. under I.R.C. § 183)." H.R.Rep. No. 658, 94th Cong., 2d Sess. 163, 1976 U.S. Code Cong. & Ad.News 2897, 3057; S.Rep. No. 938, 94th Cong., 2d Sess., pt. I, at 151, 1976 U.S.Code Cong. & Ad.News 3439, 3583.[7] The regulations under section 183, therefore, explicate the profit-motive requirements of sections 162 and 212, and courts have properly relied on the section 183 factors in making the profit-motive analysis under sections 162 and 212. *See Brannen v. Commissioner*, 722 F.2d at 704.

■ Under I.R.C. § 183, a taxpayer ordinarily has the burden of persuasion to show that he is engaged in an activity for profit. *See Nickerson v. Commissioner*, 700 F.2d 402, 404 (7th Cir.1983). This is merely a corollary to the general rule that an assessment of the Commissioner is presumptively correct and the taxpayer has the burden of proving it wrong. *E.g., Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). But that is not the end of the analysis; section 183 provides that an activity "shall be pre-

---

tive of income and even though the property is held merely to minimize a loss with respect thereto." 26 C.F.R. § 1.212–1(b).

**5.** Former I.R.C. § 270, enacted in the Internal Revenue Code of 1954, 68A Stat. 1, 81–82, limited the deductions of individuals whose trade or business losses exceeded $50,000 in each of five consecutive tax years. Of course it was often possible for a taxpayer to rearrange his income and deductions slightly so as to break the required string of five years. H.R.Rep. No. 413, 91st Cong., 1st Sess., 1969 U.S.Code Cong. & Ad.News 1645, 1717 (hereinafter Leg.Hist.); S.Rep. No. 552, 91st Cong., 1st Sess., Leg.Hist. at 2027, 2133.

Prior to the enactment of section 183 some courts also had disallowed loss deductions on the ground that the activity producing the loss was a hobby rather than a business, *e.g., Monette v. Commissioner*, 374 F.2d 116 (4th Cir. 1967) (per curiam), an approach that met the

approval of the House and Senate committees. H.R.Rep. No. 413, Leg.Hist. at 1717; S.Rep. No. 552, Leg.Hist. at 2133.

**6.** If an activity is not engaged in for profit, I.R.C. § 183(b) generally allows the taxpayer first to take the deductions that do not require a profit motive (e.g. interest expense, taxes), and then the deductions that do require a profit motive (e.g. depreciation, most losses), but the total of all of these deductions may not exceed gross income from the activity.

**7.** These House and Senate reports described the standards of sections 162, 183, and 212 as providing "no definitive rules" for determining whether rental of a vacation home was an activity engaged in for profit, and proposed what is now I.R.C. § 280A to deal with this specific activity. H.R.Rep. No. 658, at 162–63, 1976 U.S. Code Cong. & Ad.News at 3056–57; S.Rep. No. 938, pt. I, at 150–51, 1976 U.S.Code Cong. & Ad.News at 3582–83.

sumed" to be engaged in for profit if a taxpayer can establish that his gross income from the activity exceeded the deductions attributable thereto in two out of five consecutive taxable years. I.R.C. § 183(d). In the case of an activity "which consists in major part of the breeding, training, showing, or racing of horses," the presumption arises if gross income exceeds deductions in two out of seven consecutive years.[8] This special treatment for horse breeding activities was added by amendment on the Senate floor out of recognition that "the breeder ... is engaged in a long-cycle operation of recognized uncertainty, often requiring investment over several years of funds from other sources." 115 Cong.Rec. 38,295 (1969) (amendment of Sen. Cooper). If the relevant number of profit years is met, an activity is presumed to be engaged in for profit "unless the Secretary establishes to the contrary." I.R.C. § 183(d).

We find little assistance in the case law for determining the effect of this presumption.[9] The only comment in the committee reports on the effect of the presumption was made by Senator Gore. In his individual views appended to S.Rep. No. 552, Leg. Hist. at 2349, 2377, he complained:

[T]he Committee rule creates a highly undesirable precedent in placing the burden on the IRS of overcoming the presumption. The taxpayer is the one who has the facts and he should carry the burden of showing he intends to make a profit. While the IRS has the burden of proof in cases involving fraud, it does not and should not in ordinary tax cases.

Unless the statutory language is ignored, and we do not think that it can be, we believe Senator Gore's comments accurately reflect what Congress did in enacting section 183. Once the taxpayer has estab-

lished that the requisite number of profit years has been met, the burden of proof shifts to the Secretary to "establish[ ] to the contrary." Not only is the wording of the statute clear, a literal construction is supported by the only legislative history on the subject. Thus, we see no reason to treat the presumption any differently than others; if nothing else appears, the presumption requires a fact finder to accept the fact presumed, in this case that the activity is engaged in for profit. *Wigmore on Evidence*, Chadbourne Rev. (1981) § 2490, 2491. The inquiry in which we then engage is whether or not the Secretary has met his burden of proof, whether he has "establishe[d] to the contrary" in the words of the statute.

■ The ultimate determination of whether an activity is engaged in for profit is to be made, according to the legislative history and the regulations, by reference to objective standards, taking into account all of the facts and circumstances of each case. A taxpayer's mere statement of intent is given less weight than objective facts. A reasonable expectation of profit is not required, but the facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit. 26 C.F.R. § 1.183–2(a); S.Rep. No. 552, Leg.Hist. at 2134 (changing a contrary House provision). The regulations list nine factors to be taken into account in determining profit objective. 26 C.F.R. § 1.183–2(b). These factors are not exclusive, and no one factor or mathematical preponderance of factors is determinative. *Id.* These factors are derived from prior case law, *see Eastman v. United States*, 225 Ct.Cl. 298, 635 F.2d 833, 838 (1980) (per curiam), and thus it is appropriate to consider the prior case law

---

**8.** For purposes of determining whether the presumption of I.R.C. § 183(d) is met, deductions are determined without regard to whether the activity is engaged in for profit. *Id.*

The parties are in agreement that the farming operation in question here "consists in major part of the breeding, training, showing or racing of horses."

**9.** Two Tax Court cases in which the presumption was met or arguably met provide little

insight. *See Hager v. Commissioner*, 76 T.C. 759, 781, 788 (1981) (activity presumed engaged in for profit "unless it is established to the contrary by the Commissioner"); *Dunn v. Commissioner*, 70 T.C. 715, 719 (1978) (assuming election was valid, "respondent has established that Herbert's activities were not engaged in for profit"), *aff'd*, 615 F.2d 578 (2d Cir.1980).

in interpreting these factors as well as in the consideration of additional relevant factors.

## III

The sole issue on appeal is whether the taxpayers' farming activity was engaged in for profit. Whether the farm was thus a business or a hobby is essentially a question of fact, and we must affirm the decision of the Tax Court in this regard unless it was clearly erroneous. I.R.C. § 7482(a); FRCP 52(a); *Commissioner v. Duberstein,* 363 U.S. 278, 291 & n. 13, 80 S.Ct. 1190, 1199 & n. 13, 4 L.Ed.2d 1218 (1960); *Monette v. Commissioner,* 374 F.2d 116, 117 (4th Cir.1967) (per curiam). A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Inferences from undisputed facts are also subject to the clearly erroneous rule, *id.* 333 U.S. at 394, 68 S.Ct. at 541, but of course the rule itself has no application where there has been an erroneous interpretation of the applicable legal standard. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 43–44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

■ We think the Tax Court at the least did not apply correctly the statutory presumption. The IRS had stipulated that the taxpayers had met the statutory requirements of I.R.C. § 183(d) and that their farming operation during the taxable years in question was presumed to be engaged in for profit. This stipulation was supported by further stipulations that the taxpayers had shown a net profit in 1971 and 1975 of $14,281.84 and $3,160.00 respectively. The Tax Court mentioned this stipulation, but then equivocated on giving effect to the statutory presumption:

> [W]e think that respondent [IRS] has established that petitioner's farming operation was not an activity engaged in for profit, even if, arguendo, we treat the section 183(d) presumption as being fully operative. Therefore, we need not decide whether the presumption under section 183(d) should be accorded its usual weight although the amounts of profits earned in 1971 and 1975 are insignificant in relation to the amount of the total loss incurred by petitioner and the profits earned in 1975 are attributable to the sale of most of petitioner's breeding stock.

We think that this reasoning, although purporting to restrict the basis for decision to necessary issues, manifests a fundamental misunderstanding of the statutory presumption. We find no support in the authorities for the view that the statutory presumption can be "fully operative" or less than fully operative, or for that matter that it has a "usual weight." Further, the amounts of any net profits are irrelevant to a determination of whether the presumption has been met and to the effect of the presumption. With respect to the particular facts here, there is nothing to suggest that income from the 1975 sale of breeding stock was not "derived from" the farming activity and as such had to be included in any determination of whether the presumption had been met. I.R.C. § 183(d). There is also no explanation of why the Tax Court chose virtually to ignore the stipulation of the parties that the taxpayers had met the statutory presumption.

The taxpayers were presumed to be engaged in their farming activity with the objective of making a profit under I.R.C. § 183(d), and, as we have explained, the IRS had the burden of proving otherwise.[10]

**10.** We note that the Tax Court also required of the taxpayers a "predominant purpose and intention" of making a profit. The regulations provide that an activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit, 26 C.F.R. § 1.182– 2(b)(9), but that deductions are not allowable under sections 162 or 212 for activities carried on primarily as a sport or hobby, or for recreation. 26 C.F.R. § 1.183–2(a); *see id.* § 1.212– 1(c). Our cases under section 162 have required only "the purpose of making a profit." *Malmst-*

A review of the taxpayer's farming activity under the relevant factors in the regulations and the case law convinces us that the IRS did not sustain its burden.

*Manner in which the taxpayer carries on the activity.* 26 C.F.R. § 1.183–2(b)(1).

Subsection b(1) provides that if the taxpayer carries on the activity in a businesslike manner and maintains accurate books and records, that may indicate the activity is engaged in for profit. Where an activity is carried on in a manner substantially similar to other profitable activities of the same nature, a profit motive may also be indicated. Changes in operating methods, adoption of new techniques and abandonment of unprofitable methods may also indicate a profit motive.

The Tax Court found that the taxpayers admittedly did not intermingle financial records of the farm and personal records. Indeed, the taxpayers' record keeping and separation of accounts seems rather impressive, especially considering that the farm was a sole proprietorship. The Tax Court faulted the taxpayers, however, for not having prepared formal budgets, operating statements, or analyses of the farm records to determine how costs could be controlled or whether to emphasize certain aspects of the farming activity. The testimony in this regard, however, was that Faulconer could tell from his records what were the expenses and profits from the various aspects of the farming activity, and that there was no way to predict, for example, if, how long, or how successfully a horse would race in a particular year so as to prepare a formal budget. Moreover, Faulconer had sought expert advice and changed his operating methods to improve the profitability of his farming activity, both indicia of activity for profit mentioned in this same regulation which is discussed further below. All in all, the evidence considered under this subsection does not weigh unfavorably toward taxpayers.

*Expertise of the taxpayer or his advisors.* 26 C.F.R. § 1.183–2(b)(2).

Subsection b(2) provides that extensive study of accepted business, economic, and scientific practices, or consultation with those who are expert, may indicate a profit motive. Where the taxpayer has such knowledge or advice but does not carry on the activity in accordance with good practice, a lack of intent to derive profit may be indicated.

The Tax Court properly recognized the IRS's concession that Faulconer had expertise in the training and breeding of horses, which he had gained by conducting the farming activity. Faulconer is a member of the Virginia Thoroughbred Association and was on its board of directors for more than twenty years. He grew up on the farms at issue here, which his father owned and operated from 1916 until his death in 1947. From 1947 to 1950, Faulconer operated the farm as coexecutor of his father's will, and thereafter basically continued on his own the farming operation

edt v. Commissioner, 578 F.2d at 527; *Cecil v. Commissioner,* 100 F.2d at 899.

We find nothing in section 183 or its legislative history changing this analysis or requiring this purpose to be predominant. *See generally* Note, *On Deducing a Deductible Loss,* 15 Conn. L.Rev. 847, 854 (1983); Samansky, *Hobby Loss or Deductible Loss,* 34 U.Fla.L.Rev. 46, 51–52 (1981). Section 183 requires simply that an activity be "engaged in for profit." The Senate report indicates only that under section 183 a taxpayer must have entered or continued an activity with "the objective of making a profit." S.Rep. No. 552, Leg.Hist. at 2134, a formulation virtually the same as that we announced in *Cecil* and *Malmstedt.*

We recognize, however, that under a related provision, I.R.C. § 166, the Supreme Court has required that a taxpayer have a "dominant business motivation" to avoid the less favorable tax treatment of nonbusiness bad debts, *United States v. Generes,* 405 U.S. 93, 103, 92 S.Ct. 827, 833, 31 L.Ed.2d 62 (1972), and that other courts have required under sections 162 and 183 that a taxpayer have the "primary purpose" of making a profit. *E.g., Nickerson v. Commissioner,* 700 F.2d 402, 404 (7th Cir.1983); *Eastman v. United States,* 225 Ct.Cl. 298, 635 F.2d 833, 837 (1980) (per curiam).

Whether or not a taxpayer must have the "primary" or "predominant" purpose of making a profit under sections 162, 183, or 212, we need not and do not decide because we think that in either event the IRS did not sustain its burden of showing that the taxpayers here did not engage in an activity for profit.

of his father. The Tax Court properly found that Faulconer employed expert professionals to care for and train his horses, and consulted experts and professional periodicals when making breeding decisions.

The Tax Court found that Faulconer did not investigate whether the farm could be operated at a profit when he entered the activity in 1950, but only continued the operation of his father, and that he had only sought specific business advice once on how to increase the profit since that time from Dr. O'Keefe. The parties, however, stipulated that Faulconer called upon Dr. O'Keefe frequently for advice on the breeding and racing operation; Dr. O'Keefe is, among other things, a director of one of the outstanding thoroughbred-sales companies in the world who also conducts a successful breeding and racing operation of his own. The undisputed evidence is that Faulconer had called upon Dr. O'Keefe for advice on the farming operation since 1947.

We do not think that the occasion on which Faulconer specifically sought advice from O'Keefe on the profitability of Faulconer's farms should be held against the taxpayers. In 1968 and 1969, when the new tax act came in, Faulconer asked Dr. O'Keefe what he could do to show a profit, saying that he had the best of intentions of showing a profit but that he had not. The Tax Court attached great significance to the timing of this consultation and in fact found that Faulconer's inquiry was framed in terms of showing a profit for two years out of seven to have the benefit of the statutory presumption, and not of achieving what it called a "true profit." We cannot agree. Dr. O'Keefe recommended that Faulconer sell more horses and not race as many; in other words, change from running primarily a racing stable to running a racing and sales stable. The Tax Court discredited this advice, in essence opining that less profit would result if the advice were followed. Of course racing purses would decline, but an increase in sales certainly could improve the profit picture, an obvious benefit the Tax Court failed to explore. Faulconer testified that

after he consulted with Dr. O'Keefe, his pattern changed to one of selling more two-year-old horses rather than three- or four-year-old horses, and to making more private sales. The record indicates that Faulconer in fact increased his sales after 1969, and was able to cut his net losses significantly. From 1950 to 1969, his annual net loss averaged $35,406.20, but from 1970 to 1976 his annual net loss averaged $14,735.27, a reduction in average net losses of about $20,670.93 annually. We think that rather than evidencing a lack of objective to achieve a "true profit," as the Tax Court phrases it, Faulconer's seeking of business advice, implementing a major change in his operation, and substantially reducing his losses are strong indications of an objective to turn a profit. Subsection (b)(1) and (2) of the applicable regulations so indicate. The evidence with respect to this part of the regulation weighs heavily in favor of the taxpayers. In this connection, we remember that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935).

*Time and effort expended by the taxpayer in carrying on the activity.* 26 C.F.R. § 1.183–2(b)(3); and

*Financial status of the taxpayer.* 26 C.F.R. § 1.183–2(b)(8).

Subsection b(3) provides that the devotion of much personal time and effort to the activity, particularly if it does not have substantial personal or recreational elements, may indicate an intention to derive a profit. Subsection b(8) provides that the fact that a taxpayer does not have substantial income from other sources than the activity may indicate that the activity is engaged in for profit, and if the taxpayer does have substantial income from such other sources, particularly if losses from the activity generate substantial tax benefits, that may indicate the activity is not engaged in for profit, especially if there

are personal or recreational elements involved.

The Tax Court found that Faulconer has devoted much time and effort to his farming activity. The evidence is that he devotes nearly all his time to the farming operation. Indeed, Faulconer's operation is of a size requiring significant time and effort. The two farms cover an aggregate area of 815.25 acres. At least until 1975 Faulconer had an average of 10 brood mares, which were giving birth to about 8 foals each year. Faulconer raced his horses, primarily in Maryland but also in Delaware, Pennsylvania, New Jersey, New York and Florida. Faulconer also had 105 to 125 head of cattle, and raised hay for the cattle and the horses. He employed from two to six farm workers on the farms. The parties stipulated that Faulconer plays an active role in the operation of the farm. He performed physical labor himself, "bale[d] hay, and did everything" until 1966, when he curtailed his physical activities on the farm on the advice of his physicians following surgery for detached retinas. Since then, however, he has continued to make decisions on breeding, handling, racing, and selling the horses, and has supervised the horse trainers and farm personnel. He receives minimal wages and salary from other sources.

The Tax Court discounted these facts because Faulconer had other income primarily in the nature of dividends, interest, and trust income which averaged $70,173.07 annually for the years 1970 to 1976, a fact which prompted the Tax Court to remark that Faulconer "did not have to work for a living."

Although substantial income from other sources may in some instances indicate that an activity is not engaged in for profit, the legislative history of section 183 indicates Congress' recognition that horse breeding by its very nature often requires investment over several years of funds from other sources. 115 Cong.Rec. 38,295 (1969). Also, in the case at hand, the farming activity has been Faulconer's primary

occupation for more than 27 years. He has not run an absentee operation of the type common to many "hobby loss" cases. *See Edge v. Commissioner*, 1973 T.C.M. (P–H) ¶ 73,274, at 1250. We therefore cannot see how the availability of outside funds to engage in and continue such an operation, quite risky by its very nature, should count against Faulconer when Congress itself realized that such funds often would be required.

The record does not show any recreational element involved in Faulconer's farming activity. The only personal element involved is that Faulconer lives on and works the family farm. We are of opinion this fact may not be held against the taxpayer, and whatever the personal elements may be as spoken of in the regulations, they do not include living and working on the family farm.

Thus, in every aspect, according to subsections (b)(3) and (b)(8), the evidence is weighted in the taxpayer's favor.

*Expectation that assets used in the activity may appreciate in value.* 26 C.F.R. § 1.183–2(b)(4).

Subsection b(4) expressly provides that "the term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity."

The Tax Court acknowledged that the two farms at issue here appreciated in value between 1970 and 1976. According to the parties' stipulation, the appraised market value of the farms increased by $1,392,500 during these years. The Tax Court decided, however, that this appreciation should not be considered an indication of profit motive, because it found that the land-holding and the farming were two separate activities and thus under section 183 could not be considered together. *See* 26 C.F.R. § 1.183–1(d)(1).

The IRS, however, prudently has disavowed on appeal the Tax Court's holding that the land-holding and the farming were separate activities.[11] It contends, however,

11. Counsel for the IRS made the following con-     cession at oral argument:

that the appreciation of the land may not be considered in deciding whether the taxpayers had a profit objective because the taxpayers did not own the farms outright. Upon the death of Faulconer's mother, one of the farms, Westover, passed to Faulconer for life or until he should decide not to continue residing at Westover. Upon the death of Faulconer, or if he decides not to continue living at Westover, this farm passes to a trust created by the will of Faulconer's father. The other farm, Buck Island, passed directly to the trust upon the death of Faulconer's mother, and Faulconer leases it from the trust. The taxpayers and their children are the income beneficiaries of the trust (taxpayers receive 2 shares (40%) and the children 3 shares (60%)) and will remain so until the taxpayers' death, at which time the trust will terminate and the trust estate, including the real estate, will pass to the taxpayers' children. Faulconer and the National Bank and Trust Co. at Charlottesville were designated co-trustees of the trust under the will of Faulconer's father, and were expressly given the power under the will

> without regard to any legal or statutory restriction otherwise applicable to fiduciaries....
>
> (5) To sell and, by their sole deed without the union of any beneficiary, to convey or lease for any period (whether or not extending beyond the duration of the trust) any and all real estate of which I may die seized and possessed or which may come into their hands as Trustees; to alter, improve or otherwise deal with or dispose of land real property of [sic] interest therein.

The objective facts, which are what must control in determining profit objective, are thus that Faulconer is operating the farms and, as life tenant of Westover and tenant of Buck Island, holding the farmland in what the IRS concedes is a single activity. As co-trustee, Faulconer could, with the consent of the bank, sell Buck Island and invest the proceeds otherwise. He also could unilaterally cause title to Westover to pass to the trust by moving off of the land; he could then, with the consent of his co-trustee, sell Westover and reinvest the proceeds for the trust. He has instead retained both farms for the farming activity, and the appreciation of the land between 1970 and 1976 alone (1.39 million) has far exceeded (by more than $1.2 million) the net operating losses ($103,146.91) of the activity for those years. Indeed, the appreciation in these seven years alone has exceeded by more than $600,000 all of the net operating losses ($708,123.97) incurred since 1950 when Faulconer commenced his present farming activity. We think it is not controlling that the appreciation of the real estate used in the activity may well inure ony to the benefit of taxpayers' children, while any net operating profit will inure to the taxpayers' immediate benefit. Simply put, many taxpayers conduct activities for profit in which the ultimate recipients of that profit may be their children. One further and even more important thought along this line deserves mention. Mr. & Mrs. Faulconer are past middle age, and the demands of time work upon us all. Should either or both of them fall prey to serious illness or disability, it is entirely likely that both farms would be sold and the proceeds placed in the trust. In that event, taxpayers would immediately realize the benefit of their labor of many years and good husbandry of the farms in the increased earnings certain from the increased investments of the trust. Thus, it is not accurate to say that taxpayers have received no benefit from the appreciation of the farms. We conclude that the great appreciation of the farms under taxpayers' stewardship is a factor to be weighed in their favor although not quite as much, perhaps, as if they owned the lands in fee simple.

---

The Tax Court said it was not operated as a single activity, and we are to that extent disavowing what the Tax Court held.... Here it is our position that the taxpayer has no interest in the land—all he had was merely a life estate in Westover, and he was a tenant in Buck Island—so any appreciation in that land was not going to inure to the benefit of the taxpayers.

*Success of the taxpayer in carrying on other similar or dissimilar activities.* 26 C.F.R. § 1.183–2(b)(5). The Tax Court found, as the parties agree, that the taxpayers are engaged in no similar or dissimilar activities.

*History of income or losses with respect to the activity.* 26 C.F.R. § 1.183–2(b)(6); and

*Amount of occasional profits, if any, which are earned.* 26 C.F.R. § 1.183–2(b)(7).

Subsection b(6) provides that, while start-up losses may not necessarily be an indication the activity is not engaged in for profit, sustained losses, if not explainable, as due to customary business risks or reverses, may indicate the activity is not being engaged in for profit. Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would be strong evidence of engaging in the activity for profit. Subsection b(7) provides that the amount of profits in relation to the amount of losses and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses would not generally be determinative that the activity is engaged in for profit. Occasional substantial profit, however, would generally indicate that an activity is engaged in for profit where the investment or losses are comparatively small. An opportunity to earn a substantial ultimate profit in a highly speculative adventure is ordinarily sufficient to indicate that the activity is engaged in for profit, even though losses or occasional small profits are actually generated.

The Tax Court found the taxpayers' history of losses in the farming activity to be the most persuasive evidence that the taxpayers lacked a profit objective. As we have mentioned, the taxpayers' farming activity produced a net loss totaling $103,146.91 during the years 1970 to 1976, which figure includes the net profits realized in 1971 and 1975 of $14,281.84 and $3,160.00 respectively. The farming activity had not produced a net profit in any year before 1970, but instead had produced net losses averaging $35,406.20 annually from 1950 to 1969. Following the tax years at issue here, the taxpayers realized a net profit of $9,429.00 in 1980, but realized an overall net loss averaging $14,900.25 annually for the years 1977 to 1980.

That substantial losses rather than some net profit have resulted does not prevent an enterprise from being a business. *Cecil v. Commissioner,* 100 F.2d at 899.[12] Sustained losses, however, as we have pointed out above, particularly if unexplained, and small profits may in some cases be indicative that an activity is not engaged in for profit.

It is simply not accurate to say, as the Tax Court did, that the taxpayers' losses were "wholly unexplained." The record, without dispute, indicates that in the years 1967 to 1970 alone Faulconer suffered several setbacks. Three horses out of ten available for racing suffered broken knee or ankle bones in 1969. A promising horse purchased in 1967 for $16,000 proved to be of little value in racing and was sold for $3,500 in 1969. Another promising horse developed the dangerous habit of running into its stall and was sold at the insistence of the horse's trainer in 1968. Ironically, after the sale, the horse went on to win $135,000 in racing purses in 1969 and 1970 and won "Filly of the Year" award in 1969 and "Mare of the Year" award in 1970.

---

**12.** We note parenthetically that farming is not the most profitable business in which one can be engaged. Official statistics for the tax years in question here show that, nationwide, average net income per farm was $4,877 in 1970, $9,771 in 1974, $10,137 in 1975, and $8,062 in 1976. U.S. Bureau of the Census, Statistical Abstract of the United States 661 (1984). For Virginia, the net average income per farm was even less: $2,304 in 1970, and $3,844 in 1975. Va. Crop Reporting Service, Va. Dep't of Agriculture & Consumer Serv's & U.S. Dep't of Agriculture, Virginia Agricultural Statistics 89 (1983).

These items alone go a long way in explaining the taxpayers' losses at least as far as the years immediately prior to those at issue here.

The Tax Court discounted even the modest profits made in 1971 and 1975 on the ground that they were attributable to the number of horses sold in those years. It is true that most of the sales of mares in 1975 were made necessary because of the death of Faulconer's farm manager of 50 years and the illness of his other farm hand. We note, however, that consistent with continuing a horse sales business, Faulconer has increased the number of brood mares since 1975 and that horse sales of $39,082.00 contributed to his net profit in 1980. There was nothing extraordinary about the horse sales in 1971. On the contrary, even the Tax Court found that the horses were sold pursuant to Dr. O'Keefe's advice, a fact which we have explained indicates profit objective.

Moreover, the history and amount of net profits and losses in the farming activity must be examined not for evidence of profit objective in the abstract but in the context of whether the activity is a business. In this regard, we have explained that if gross receipts from a business are practically negligible in comparison with expenditures over a long period of time, there may be a compelling inference that a taxpayer's real motives are those of personal pleasure as distinct from a business venture. *Cecil v. Commissioner*, 100 F.2d at 899. This certainly was not the case here, where gross receipts averaged $83,537.21 annually from 1970 to 1976. Dr. O'Keefe testified that the earnings and expenses of the taxpayers' stables were comparable to those of the Hawksworth Farms before the Hawksworth Farms purchased Spectacular Bid as a yearling and ultimately realized earnings of $759,000 in 1978 and $745,000 in 1979. Faulconer had good breeding practices. He had been breeding his mares to stallions whose foals had won several million dollars in racing purses; the mares that he owned from 1970 to 1976 produced foals that won purses of $1,818,008, indicating an above-average band of brood mares;

and his own horses had won $197,610.00 in purses in the years 1970 to 1976, which included 29 first-place finishes. It just so happened that Faulconer never came up with a Spectacular Bid. That, of course, was nothing more than the luck of the draw in this risky business.

The evidence of business hardships, the presence of substantial receipts and some net-profit years, and the similarity of Faulconer's operation to another horse farm that ultimately achieved great profitability, all tend to show that the taxpayers had a profit objective and thus were engaged in a business under these regulations. As subsection (b)(7) specifically recognizes, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated."

*Elements of personal pleasure or recreation.* 26 C.F.R. § 1.183–2(b)(9).

Subsection b(9) provides that the presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. It is not necessary, however, that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits.

None of the race horses on the farms were ridden by the taxpayers or by any members of their family. The only evidence in the record as to the taxpayers' "personal pleasure or recreation" was Faulconer's affirmation that he gets some personal pleasure or satisfaction from his involvement in the racing profession and his work on the farm. The Tax Court properly found that gratification received from an activity is insufficient in itself to cause the activity to be considered not engaged in for profit. We think that in this case, where there is no other evidence of personal pleasure or recreation, it is irrelevant.

... [A] business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility. "Success in business is largely obtained by pleasurable interest therein."

*Jackson v. Commissioner*, 59 T.C. 312, 317 (1972), *citing Wilson v. Eisner*, 282 Fed. 38, 42 (2d Cir.1922).

## IV

In sum, the IRS stipulated that the taxpayers met the presumption of I.R.C. § 183(d) that they were engaged in the farming activity for profit. The effect of this presumption was to shift the burden of proof [13] to the IRS to show that the taxpayers were not engaged in the activity for profit. A review of all the facts and circumstances surrounding the taxpayers' farming activity and of all the factors mentioned in the relevant IRS regulations leaves us with the "definite and firm conviction that a mistake has been committed," that the IRS did not meet its burden, and that the taxpayers are in fact engaged in the activity for profit and thus engaged in a business. This simply is not a case in which a taxpayer has invested in a farm operation to obtain tax losses so as to reduce his taxes on other income. *See* H.R. Rep. No. 413, Leg.Hist. at 2376. Working the family farm has been Faulconer's occupation for more than a quarter of a century, and he has lived on it almost 50 years. It is not a hobby farm in any sense of the words.

The judgment of the Tax Court is reversed and the case is remanded for entry of a final order by the Tax Court in favor of the taxpayers. In framing its final order the Tax Court will take into account the revised figures for profits and losses made necessary by the reallocation of income mentioned in footnote 2 hereof and associated text.

REVERSED AND REMANDED.

13. Since evidence was produced by both sides at the trial, there is no question here concerning the production of evidence. The burden of per-

suasion remains on the Secretary to the extent provided for in the statute.