ROBERT AND RACHAEL REMUZZI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Remuzzi v. Commissioner
Docket No. 32962-85.
United States Tax Court
T.C. Memo 1988-8; 1988 Tax Ct. Memo LEXIS 8; 54 T.C.M. (CCH) 1479; T.C.M. (RIA) 88008; January 6, 1988. F. Brook Voght and Martin Scully, Jr., for the petitioners. Alan C. Levine, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1980
$ 10,722.93
1981
15,857.03
After concessions, the issues for decision are: (1) Whether petitioners' farm was an "activity not engaged in for profit" within the meaning of section 183; (2) whether a bad debt incurred by petitioners was a business bad debt; and (3) whether petitioners are entitled to investment tax credit *10 in excess of the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners were residents of Leesburg, Virginia, when they filed their petition herein. They timely filed joint Federal income tax returns for the years at issue. Petitioner Robert Remuzzi ("Dr. Remuzzi") is an orthopedic surgeon. His wife Rachael Remuzzi ("Mrs. Remuzzi") is a housewife. They and their five children live in Leesburg on a 74 acre farm that Mrs. Remuzzi named Fairleigh Farm. Dr. Remuzzi was born in New York City and attended college and medical school at Georgetown University in Washington, D.C. Mrs. Remuzzi was raised on a farm in Australia. Dr. and Mrs. Remuzzi were married in the early 1970s and moved to Leesburg in 1974 when Dr. Remuzzi was starting his medical practice. When they first moved to Leesburg, petitioners lived with their children in a home located in a housing development on a half acre lot. They quickly became interested in moving out of the development and onto a farm. In early 1976, Dr. Remuzzi began to treat Llewellyn *11 Payne ("Payne"), who was then a tenant on a farm near Middleburg, Virginia. Dr. Remuzzi told Payne of his desire to buy a farm and discussed the possibility of Payne's being a tenant on the farm. Dr. Remuzzi loaned Payne $ 15,000 and Payne agreed to become a tenant on Dr. Remuzzi's farm if Remuzzi purchased a suitable property. Dr. Remuzzi found a suitable property and purchased it in May of 1978. The property consisted of about 35 acres of pasture and 40 acres of woods. A main house, tenant house, and various farm buildings were situated on five acres. The property was in complete disrepair, and had not been operated as a farm for about ten years. Payne agreed to move to the property, repair it, and maintain it, in return for the right to live in the tenant house rent free and the right to graze his small herd of cattle on the property. Payne was to repay his loan from Dr. Remuzzi by giving Dr. Remuzzi half of the calves born to the herd until the fair market value of the calves equaled the amount of the loan. Thereafter Payne was to split his profits from raising cattle with Dr. Remuzzi. Petitioners moved to the property in August of 1978. Payne and his family moved into *12 the tenant house located on the property in November of 1978. Payne brought to the property his cattle herd, which numbered thirty head, and his farm equipment, which consisted of a tractor, a bushhog, and a small combine. During the winter of 1978-79, Payne repaired fences and bushhogged pasture land. At the end of the summer of 1979, Payne removed his herd from the property because there was not enough fenced land with pasturage on the property to support the herd. Payne brought the herd back to the property in the fall of 1979 after additional fences were repaired. Payne's behavior and work habits began deteriorating in the winter of 1979-80, and continued to deteriorate during the spring and summer of 1980. As his behavior deteriorated, he performed less and less farm work. As Payne was no longer living up to his agreement to maintain the property, Dr. Remuzzi required him to begin paying rent on the tenant house and, on July 1, 1980, had him sign a note for the $ 15,000 loan. By the fall of 1980, Payne became mentally unable to function and the local sheriff began repossessing his property, including his cattle. In the spring of 1981 Payne's wife had him committed. *13 [1] After Payne was committed, Dr. Remuzzi obtained a default judgment against him for the $ 13,800 balance of the loan. Dr. Remuzzi was unable to satisfy the judgment. As Payne began neglecting his duties, petitioners were forced to make other arrangements to have farm work done. Petitioners' oldest son, who was ten at the time, assumed responsibility for feeding the few cattle that petitioners owned. [2] Petitioners hired college students to perform other necessary maintenance work. Dr. Remuzzi separated his expenses for the property from his family's general living expenses by maintaining a separate checking account for the property and by saving bills that related to it. He kept no other records of the property's finances, however. Petitioners reported their revenues and expenses from the property as farm income and expenses on their joint Federal income tax returns for 1978, 1979, 1980, 1981, and 1982. The results reported were as follows: Expenses
Net Income
Year
Receipts
Interest
Taxes
Other
(Loss)
1978
$ 1,200.00
$ 8,192.20
$     -   $ 8,713.18
($ 15,705.38)
1979
260.00
14,837.00
705.00
22,957.00
(38,239.00)
1980
1,200.00
15,363.00
508.00
20,416.00
(35,087.00)
1981
2,715.00
15,095.00
156.00
34,275.00
(46,811.00)
1982
360.60
11,216.15
2,212.43
10,196.16
(23,264.14)
Totals
$ 5,735.60
$ 64,703.35
$ 3,581.43
$ 96,557.34
($ 159,106.52)
*14 The receipts reported by petitioners from the property consist of the following items: Rent From
Fire
Hay &
Year
Tenant House
Timber
Wood
Cattle
Other
Total
1978
$ 1,200.00
$   -   $  -   $   -   $   -   $ 1,200.00
1979
-   260.00
-   -   -   260.00
1980
1,200.00
-   -   -   -   1,200.00
1981
1,800.00
-   50.00
865.00
-   2,715.00
1982
-   -   -   -   360.60
360.60
Totals
$ 4,200.00
$ 260.00
$ 50.00
$ 865.00
$ 360.60
$ 5,735.60
The $ 865.00 of revenue from cattle sales resulted from the sales of two sides of beef, one of which was purchased by petitioners themselves, and one of which was purchased by their friends. The $ 34,275 of "other expenses" for 1981 includes petitioners' $ 13,800 bad debt from Payne. Dr. Remuzzi reported the following earnings from his medical practice for the years 1978 through 1982: Year
Earnings
1978
$ 124,368.49
1979
138,889.00
1980
160,056.00
1981
190,661.00
1982
218,272.29
Petitioners enjoy living on their property. They take walks through the woods; *15 their son has a pony. Respondent audited petitioners' returns for the years at issue and determined that their farm losses were incurred in an activity not entered into for profit. He accordingly disallowed the following claimed losses relating to petitioners' farm activity: 1980
1981
Schedule F loss [3]
$ 35,087 $ 46,811 Less: Interest [4]
(14,163)
(12,380)
Real Estate Taxes [5]
(508)
(156)
Net Amount Disallowed
$ 20,416 $ 34,275 Respondent additionally (1) reduced petitioners' medical expense deduction for 1980 by $ 800 to reflect the increase determined in their gross income, (2) allowed petitioners a $ 3,000 deduction for 1980 to reflect their nonbusiness bad debt from Payne, and (3) reduced the investment tax credit they claimed on their 1981 *16 return by $ 220. OPINION Farm
The first issue for decision is whether petitioners operated Fairleigh Farm for profit. If Fairleigh Farm was not engaged in for profit, expenses related to its operation are deductible only as allowed by section 183. Faulconer v. Commissioner,748 F.2d 890, 893 (4th Cir. 1984), revg. T.C. Memo. 1983-165. Whether Fairleigh Farm was engaged in for profit turns on whether petitioners had a bonda fide objective of making a profit when entering into and continuing the activity. Faulconer v. Commissioner, supra at 894; Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). Petitioners' objective is a question of fact to be determined from all the facts and circumstances. Faulconer v. Commissioner, supra at 894; *17 Allen v. Commissioner,72 T.C. 28, 34 (1979). The burden of proof is on petitioners.[6]Golanty v. Commissioner, supra at 426. Greater weight is given to the objective facts than to statements of intent. Faulconer v. Commissioner, supra at 894; Engdahl v. Commissioner, supra at 666; sec. 1.183-2(a), Income Tax Regs.
*18 The regulations under section 183 list the following nine factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. Sec. 1.183-2(b), Income Tax Regs. These factors are not exclusive and are to be applied according to the unique facts or each case. Sec. 1.183-2(b), Income Tax Regs. Accordingly, no one factor, nor a majority of the nine factors, need be considered determinative. *19 Golanty v. Commissioner, supra at 426-427. In determining whether an activity is engaged in for profit, we are guided also by the Congressional purpose in enacting section 183: The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. [Citation omitted; Jasionowski v. Commissioner,66 T.C. 312, 321 (1976).]
Congressional concern stemmed from a recognition that "Wealthy individuals have invested in certain aspects of farm operations solely to obtain 'tax losses' -- largely bookkeeping losses -- for use to reduce their tax on other income. * * * One of the remarkable aspects of the problem is pointed up by the fact that persons with large non-farm income have a remarkable propensity to lose money in the farm business." S. Rept. 91-552 (1969), 1969-3 C.B. 423, 635 (Individual Views of Senator Albert Gore). See also H. Rept. 91-413 (1969), *20 1969-3 C.B. 200, 244-245; S. Rept. 91-552, supra,1969-3 C.B. at 489-490. With this background in mind we turn to the facts before us. A review of the entire record in this case convinces us that petitioners have not proven that Fairleigh Farm was an activity engaged in for profit. The record instead indicates that petitioners, who had substantial nonfarm income in each of the years at issue, simply preferred to live on a farm and attempted to deduct their personal expenses of maintaining and improving their domicile as business expenses.
Financial Status of Petitioners
Section 1.183-2(b)(8), Income Tax Regs., provides, in relevant part, that "substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit * * *." This factor indicates that petitioners did not operate Fairleigh Farm for profit. They had substantial income from Dr. Remuzzi's medical practice. The losses from Fairleigh Farm *21 offset that income and substantially reduced their tax liability.
Manner in which Petitioners Carried on Fairleigh Farm
Section 1.183-2(b)(1), Income Tax Regs., provides that the manner in which taxpayers carry on an activity is normally a factor that should be taken into account in determining whether an activity is engaged in for profit. The manner in which petitioners carried on Fairleigh Farm indicates that it was not engaged in for profit. To begin with, there is no evidence that petitioners performed any analysis before purchasing the property of the expenses that would be necessary to restore the property to operating condition. Dr. Remuzzi testified that the property had not been operated as a farm for ten years and was in a state of utter disrepair. Had he truly been approaching the purchase of the property with a view toward earning a profit by operating it as a farm, it is inconceivable to us that he would not have at least estimated the expenses of repairing the property. Once they purchased the farm, there is no evidence that petitioners *22 made any efforts to monitor its profitability or significantly reduce its expenses, which dwarfed its income during the years at issue. We believe they would have done so if they were sincerely interested in operating it profitably. Although Dr. Remuzzi testified that he planned to increase the size of his cattle herd, there is no evidence that he estimated the revenues and expenses that the property could expect to achieve with more cattle to determine whether it could then be operated profitably. We view the financial records petitioners did maintain for the property as the minimum necessary to support their deductions for tax purposes. In short, the manner in which it was operated evidence a disregard for its profitability.
History of Losses
Considering the manner in which petitioners engaged in Fairleigh Farm, it is not surprising that they suffered large and consistent losses. The revenues that petitioners received from the property were regularly dwarfed by the expenses they incurred. Sections 1.183-2(b)(6) and (7), Income Tax Regs., provide that the amount of losses suffered *23 by an activity are factors that should normally be taken into account in determining whether an activity is engaged in for profit. Petitioners' large and consistent losses indicate that Fairleigh Farm was not engaged in for profit. [7]
Petitioners blame their losses on Payne's disability, and argue that the disability was an unforeseen circumstance that was beyond their control. See sec. 1.183-2(b)(6), Income Tax Regs. Even assuming, arguendo, that their losses were due to Payne's disability, which is doubtful considering the fact that the losses began well before the disability manifested itself and continued after he left, we do not consider the loss of an employee to be the type of unforeseen or fortuitous circumstance contemplated by the regulations as beyond the control of a taxpayer. The loss of an employee, *24 whether through resignation, dismissal, or incapacitation, is a common event in the life of a business and is an occurrence that profit oriented businessmen take into account before entering businesses.
Petitioners' Business Experience
Section 1.183-2(b)(2), Income Tax Regs., provides that the expertise of the taxpayer or his advisors is a factor that should normally be considered in determining whether an activity is engaged in for profit. Neither of petitioners had ever before operated a farm. [8] Dr. Remuzzi had no farming background or expertise. Although Dr. Remuzzi testified that his wife had grown up on a farm and had once raised a cow when she was a member of the Australian equivalent of the 4-H Club, there is no evidence that she was so involved in the activities of the farm that she developed an expertise in cattle raising. Dr. Remuzzi's testimony that she was only occasionally involved in the operation of petitioners' farm suggests that she in fact had no special expertise. Although petitioners' farm tenant Payne had served as a tenant on another *25 farm and owned a small herd of cattle, there is no evidence that he had the experience and expertise required to operate petitioners' farm profitably. In sum, the experience of petitioners and Payne does not support their argument that they engaged in Fairleigh Farm for profit. Time and Effort Expended by Petitioners
Section 1.183-2(b)(3), Income Tax Regs., states that the time and effort expended by taxpayers in carrying on an activity is normally a factor to be considered in determining whether the activity is engaged in for profit. This factor does *26 not support petitioners' argument that Fairleigh Farm was operated for profit. Dr. Remuzzi was an active surgeon during the years at issue and had little time to devote to farm operations. There is no evidence that Mrs. Remuzzi or the Remuzzis' young children devoted significant time and effort to farm work. Although section 1.183-2(b)(3), Income Tax Regs., provides that "the fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity," the evidence fails to establish that petitioners did so. Petitioners concededly employed Payne to perform day to day farm work but, as was discussed supra, there is no evidence that, even before he was disabled by Alzheimer's disease, he was qualified to operate Fairleigh Farm profitably. [9] After Payne became disabled in 1980, petitioners employed only college students to perform maintenance work. There is no evidence that the students were competent and qualified to operate the farm profitably. *27 Expectation that Assets Used In Activity May Appreciate In Value
Section 1.183-2(b)(4), Income Tax Regs., provide that a taxpayer may intend to realize profit from the appreciation of the value of assets used in an activity. We accord this factor little weight in our analysis. Although petitioner did testify that Fairleigh Farm had appreciated in value, there was no evidence presented that petitioners purchased the farm expecting to profit from appreciation in its value. The evidence instead suggests that petitioners purchased Fairleigh Farm for personal reasons. Cf. Roberts v. Commissioner,T.C. Memo. 1987-182.
Elements of Personal Pleasure or Recreation
Section 1.183-2(b)(9), Income Tax Regs., provides in relevant part, that "The presence of personal motives in [the] carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or *28 personal elements involved." This factor indicates that petitioners did not engage in Fairleigh Farm for profit and explains why petitioners operated the property as they did. The evidence indicates that petitioners moved to Fairleigh Farm for personal reasons. Dr. Remuzzi's testimony established that he had decided to purchase a farm before he met Payne. [10] It was only after he met Payne, however, that he decided to raise cattle on the farm. [11] The fact that Dr. Remuzzi had decided to purchase a farm before he decided what farm activity to engage in suggests that farming was not the reason he decided to move to a farm. Other aspects of Dr. Remuzzi's testimony suggest that petitioners moved to the farm for personal reasons. He testified that his wife had been raised on a farm and it is reasonable to presume that petitioners' move to a farm was prompted by her desire to raise the family in a similar environment. He also admitted that his family enjoyed taking walks through the woods and that his son owned a pony. *29 Having applied the nine factors listed under section 183 to the facts of this case, we conclude that they fail to support petitioners' position that they operated Fairleigh Farm for profit. We accordingly hold that petitioners have failed to prove that Fairleigh Farm was an activity engaged in for profit. [12]
Bad Debt
Having concluded that petitioners have failed to prove that Fairleigh Farm was an activity engaged in for profit, we must next decide whether their $ 13,800 bad debt from Payne was a business bad debt as they argue or whether it was instead a nonbusiness bad debt as respondent determined. Petitioners have the burden of *30 proving that the debt was a business bad debt as respondent determined in his notice of deficiency that it was a nonbusiness bad debt. Welch v. Helvering,290 U.S. 111, 115 (1933); Faulconer v. Commissioner, supra at 893; Rule 142(a). A nonbusiness bad debt is defined in section 166(d)(2) as: * * * a debt other than- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.
To establish that their loss qualifies as a business bad debt, petitioners must prove that the loan to Payne was proximately related to a trade or business engaged in by them. Whipple v. Commissioner,373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. Petitioners argue that their bad debt was a business bad debt because it resulted from a loan made in connection with their operation of Fairleigh Farm. We disagree. Petitioners' argument assumes that Fairleigh Farm *31 was a trade or business. To qualify as a trade or business, a taxpayer's primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger,480 U.S.   , 107 S. Ct. 980 (1987). We have already held that petitioners have failed to prove that Fairleigh Farm was an activity engaged in for profit. We accordingly hold that they have failed to prove that the bad debt that resulted from their loan to Payne was a business bad debt. Investment Tax Credit
The final issue for decision is whether petitioners are entitled to investment tax credit in excess of the amount allowed by respondent. Petitioners have the burden of proving that they are entitled to more investment tax credit than respondent allowed in his notice of deficiency. Welch v. Helvering, supra at 115, Rule 142(a). As petitioners did not consider this issue in *32 either their original or their reply briefs, we consider it to have been conceded. Rule 151(e). See Strasser v. Commissioner,T.C. Memo. 1986-579 n. 13. To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. It was discovered later that Payne had been suffering from Alzheimer's disease. He died in 1983. ↩
2. Petitioners owned only five cattle at the end of 1981. ↩
3. These amounts reflect allowances by respondent for deductions for interest up to the amount of gross income for each year. ↩
4. These amounts reflect additional allowances for Schedule A interest deductions under sec. 163 pursuant to sec. 183(b)(1)↩. 5. These amounts reflect additional allowances for Schedule A tax deductions under sec. 164 pursuant to sec. 183(b)(1)↩.
6. Sec. 183(d) provides that if gross income exceeds deductions attributable to an activity for two (now three) or more of the taxable years in the five consecutive years ending with the taxable year at issue, there is a presumption that the activity was engaged in for profit. As petitioners had not yet operated Fairleigh Farm for five years at the close of the years at issue, sec. 183(e) allows them to elect to have the determination of whether the presumption applies be made at the close of the fourth taxable year following the taxable year in which they first engaged in the activity. Sec. 183(e)(3) requires the election under sec. 183(e) to be made at such time as the Secretary prescribes. Sec. 12.9(c)(2), Temp. Income Tax Regs., 39 Fed. Reg. 9947 (March 15, 1974), requires the election to be made no later than sixty days after the taxpayer receives written notice proposing to disallow deductions attributable to an activity not engaged in for profit under sec. 183. Although the record does not establish whether petitioners timely made a sec. 183(e) election, it does establish that they would not be entitled to the presumption provided by sec. f183(d) even if they had such an election. Fairleigh Farm was unprofitable in each of its first five years of operation, 1978 through 1982. This case is therefore distinguishable from Faulconer v. Commissioner,748 F.2d 890 (4th Cir. 1984), revg. T.C. Memo. 1983-165, in which a taxpayer had placed the burden of proof on respondent under sec. 183(d)↩ by proving that an activity was profitable for two out of five consecutive years. 7. Cattle farming is not a highly speculative activity such as horse racing in which taxpayers have an opportunity to earn substantial profits in one year to offset losses suffered in others. Cf. Faulconer v. Commissioner, supra.↩
8. The factor provided by sec. 1.183-2(b)(5), Income Tax Regs.↩, -- whether petitioners had successfully engaged in other activities -- does not support their argument that they engaged in the farm for profit. Although Dr. Remuzzi was a successful surgeon, the evidence indicates that his success was due to his surgical skill and the need for orthopedic surgeons in the Leesburg area. There is no evidence that it was due to business skill that was transferable to farming.
9. The only evidence of Payne's qualifications was Dr. Remuzzi's testimony that he had been a tenant on another farm. There was no evidence that he had raised cattle profitably.↩
10. Dr. Remuzzi testified that he talked to Payne and "expressed to him my desire to buy a farm * * *." ↩
11. Dr. Remuzzi testified that he and Payne talked and ultimately "decided to do what a number of other people were doing in the county, which was basically a cow calf operation." ↩
12. Petitioners argue on brief that respondent erred by disallowing "even the interest and real property taxes deducted as part of [petitioners'] farm operation." They request that this Court "note this erroneous treatment in its opinion." We have reviewed respondent's treatment of the interest and real property taxes and find it to be correct. Respondent properly allowed the deduction of the interest and taxes pursuant to sec. 183(b)(1)↩.