EDWIN B. AND MARGARET FELDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feldman v. Commissioner
Docket No. 23611-86.
United States Tax Court
T.C. Memo 1988-126; 1988 Tax Ct. Memo LEXIS 154; 55 T.C.M. (CCH) 450; T.C.M. (RIA) 88126; March 24, 1988; As amended March 30, 1988 *154 TMelville W. Feldman, for the petitioners. Elizabeth S. Henn, for the respondent KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In a timely statutory notice of deficiency, respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Taxable
Addition to Tax [1]
Year
Deficiency
Section 6661
1982
$ 24,071
$ 2,407
1983
7,674
767
After concessions, the issues for decision are:
1. Whether petitioner Edwin Feldman's yacht chartering activity constituted an "activity not engaged in for profit" within the meaning of section 183(a).
2. Whether the yacht purchased by petitioner [2] and used in his yacht chartering activity qualifies for the investment tax credit in 1982, and if so, the amount of the credit. 3. Whether petitioners are liable for additions to tax for substantial understatements of tax liability as provided by section 6661.
4. Whether the interest rate applicable *155 to any deficiencies is that imposed pursuant to section 6621(c) on substantial understatements attributable to tax motivated transactions. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are cash basis, calendar year taxpayers. They are also husband and wife and resided at Trappe, Maryland, at the time their petition herein was filed. Petitioners filed joint Federal income tax returns in each of the years at issue. During the taxable years at issue, petitioner was a successful real estate developer, a business in which he had been involved for some 24 years. Petitioner's home was located on the waterfront near the Choptank River, which runs into Chesapeake Bay. Petitioner had for many years been involved in sailboating for sport and recreation. In 1973 he purchased his first boat, a 35-foot Coronado. In 1978 petitioner sold the Coronado and purchased a 35-foot Pearson sailing sloop for $ 38,000. During *156 the taxable years at issue, petitioner continued to own the Pearson, which he used exclusively for pleasure. At some point during the fall of 1982, petitioner became interested in acquiring another sailboat for placement in a charter fleet. Petitioner desired to engage in an activity which would keep him active after he had retired from real estate development. He felt that he could generate a positive cash flow, before interest expenses, from sailboat chartering. Petitioner also felt that sailboats offered good appreciation potential. Despite petitioner's considerable sailing experience, however, he had no expertise in the business of sailboat chartering. After investigating several boat builders and charter operators, petitioner entered into a contract to purchase a 41-foot ketch (the "Whim II") from Donald Griffin in December of 1982 for $ 135,000. The Whim II had been built by Dickerson Boat Builders, Inc. (hereinafter referred to, collectively with its affiliate, as "Dickerson"). [4] *157 Mr. Griffin was a part-owner of Dickerson. Petitioner financed the purchase of the Whim II with a $ 135,000 recourse loan from Suburban Bank. The Whim II had been built by Dickerson as a "show boat" i.e., a boat which was placed on display at various boat shows as an example of Dickerson workmanship. As such, it contained many extra features such as teak decks and special finishes not found on other Dickerson 41s. When the boat was not being shown at shows, it was made available for charter. The boat was very popular and had been chartered by Dickerson extensively during the 1982 charter season. Concurrently with his purchase of the yacht, petitioner entered into a five-year "Management Agreement" with Dickerson. The agreement commenced December 23, 1982, and ran through the conclusion of the fifth charter season thereafter on November 31, 1987. [5] The agreement provided that Dickerson would be petitioner's exclusive agent for charter and management of the yacht. In exchange for its management services, Dickerson was to receive 40 percent of the gross charter revenues generated from the first *158 eight weeks of the yacht's charter during a charter season; 50 percent of gross revenues from the ninth through twelfth weeks of charter; and 60 percent of gross revenues from charters in excess of twelve weeks during a charter season. Additionally, petitioner was guaranteed minimum revenues of $ 5,520, net of Dickerson's management fee, per charter season. The agreement also provided that Dickerson would be responsible for performance of all routine maintenance and repair work on the vessel, the cost of which would be charged to petitioner. [6] During 1983, the yacht was chartered for an aggregate of approximately nine and one-half weeks of the charter season for gross charter revenues of $ 10,750. [7] *159 Of that amount, Dickerson received $ 4,455 in management fees pursuant to the Management Agreement. During the 1983 charter season, petitioner became increasingly dissatisfied with both the cost and quality of the maintenance services provided by Dickerson pursuant to the management agreement. [8] As petitioner's disillusionment with Dickerson grew, he began to investigate the possibility of having another charter operator manage his yacht. He was dismayed to discover, however, that most charter operators would not handle a vessel that they had not sold. Petitioner concluded that his entry into the charter business had been a mistake. In early August 1983, petitioner and Dickerson agreed to terminate their relationship as of September 30, 1983. At that time, petitioner also decided that he would put the Whim II up for sale. On October 31, 1983, petitioner entered into an agreement with Interyacht, Inc. of Annapolis under which Interyacht would be his exclusive agent for sale of the Whim II. The yacht was listed at an asking price of $ 115,000. The agreement with Interyacht *160 was to remain in effect until March 1, 1984, unless extended. During this period, the yacht was moored at petitioner's own dock at his residence. No purchaser for the yacht was found during this period. On April 11, 1984, a new six-month agency agreement was entered into with Interyacht. The asking price was increased, at Interyacht's suggestion, to $ 118,500. Also at Interyacht's suggestion, the yacht was moved to Port Annapolis Marina where it was removed from the water in order to facilitate its inspection by prospective purchasers and to minimize routine cleaning and maintenance costs. Despite extensive advertisement, Interyacht was unable to find a buyer for the yacht and this agreement was terminated on or about October 25, 1984. On December 15, 1984, petitioner entered into a new agreement with Hartge Yacht Sales, Inc. (hereinafter "Hartge"), whereby Hartge agreed to be petitioner's exclusive agent for sale of the yacht. The sale price was reduced to $ 110,000. In the spring of 1985, the yacht was moved to Hartge's boat yard in Galesville, Maryland, where it was placed on the water and offered by petitioner for charter while Hartge's sales efforts continued. By offering *161 the yacht for charter, petitioner hoped to offset some of the carrying costs he was bearing while awaiting sale of the boat. Petitioner was able to charter the boat to Peter Hirschfeld, and acquaintance of petitioner's son, for various weekends during the period from May 4, 1985 to November 27, 1985, at a rate of $ 420 per weekend. Petitioner's exclusive sales agreement with Hartge was terminated in November 1985, whereupon Hartge continued as a sales broker with an "open listing" (i.e., anyone, including Harge, could offer and sell the yacht). Finally, the yacht was sold through Hartge's efforts on May 25, 1986, for $ 85,000, less commission to Hartge of $ 8,000. No charter fees had been received by petitioner during the 1986 charter season prior to the yacht's sale. During the period of his ownership, petitioner did not use Whim II for personal pleasure purposes. On April 2, 1986, respondent mailed a statutory notice of deficiency to petitioners for taxable years 1982 and 1983. In the notice, respondent determined, inter alia, that petitioner's yacht chartering activity was an activity not engaged in for profit during the years at issue. Accordingly, he disallowed petitioner's *162 claimed losses from his yacht chartering activity of $ 20,994 and $38,083 in 1982 and 1983, respectively. Additionally, he increased petitioners' 1982 tax liability by the $ 13,500 investment tax credit claimed with respect to the Whim II in that year. Respondent also determined that petitioners' underpayments of tax liability in each year at issue were substantial and imposed additions to tax pursuant to section 6661. Finally, respondent determined that the substantial underpayment of tax was due to a tax motivated transaction and all interest accruing on the underpayments after December 31, 1984 should be calculated using the rates prescribed by section 6621(c). Petitioner acquired Whim II with the objective of putting it out for charter at a profit. OPINION 1. Section 183 Issue
Respondent does not contest the amount of the deductions claimed by petitioners in the years at issue or that they were in fact incurred with respect to petitioner's chartering activities. Rather, he asserts that petitioner's chartering activity was an activity not engaged in for profit. An "activity not engaged in for profit" is defined in section 185(c) as an activity other than one with respect *163 to which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212. If an activity is not engaged in for profit, section 185(b) (1) allows only those deductions which are not dependent on a profit motive. Section 183(b) (2) allows all other deductions which would be allowable if the activity was engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b) (1). Deductions are allowable under section 162 for expenses of carrying on an activity which constitutes the taxpayer's trade or business if those expenses are ordinary and necessary to the conduct of the trade or business. Section 212 allows the taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. In order to deduct expenses of an activity under either section 162 or 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,85 T.C. 557, 569 (1985); *164 Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, "profit" means economic profit, independent of tax savings. Landry v. Commissioner,86 T.C. 1284, 1303 (1986), on appeal (5th Cir., Jan. 12, 1987); Herrick v. Commissioner,85 T.C. 237, 255 (1985); Beck v. Commissioner, supra at 570; Estate of Baron v. Commissioner,83 T.C. 542, 557-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Surloff v. Commissioner,81 T.C. 210, 233 (1983). The motive of obtaining an economic profit must be the taxpayer's primary motive for engaging in the activity. Brannen v. Commissioner,722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Surloff v. Commissioner, supra;Golanty v. Commissioner, supra;Allen v. Commissioner,72 T.C. 28, 33 (1974). While the expectation of economic profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued it, with the objective of making a profit. Beck v. Commissioner, supra; *165 Fox v. Commissioner,80 T.C. 972, 1006 (1983); Dreicer v. Commissioner, supra.
The burden of proof is on petitioner to show that he engaged in his boat chartering activity with the primary objective of realizing an economic profit. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). In making this determination, all relevant facts and circumstances are to be taken into account.[9] *166 Finoli v. Commissioner,86 T.C. 697, 722 (1986); Golanty v. Commissioner, supra;Jacionowski v. Commissioner,66 T.C. 312, 321 (1976). Greater weight must be given to objective facts than to petitioners' mere statements of intent. Sec. 1.183-2(a), Income tax regs.; Beck v. Commissioner, supra;Flowers v. Commissioner, supra;Seigel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). After carefully reviewing the entire record before us, we conclude that petitioner has satisfied his burden of proving that profit was the primary motive of his activities in the years at issue. We found Mr. Feldman's testimony as to his profit motivation in his yacht chartering activities to *167 be credible and corroborated by the testimony of Mr. Karr, the Dickerson salesperson with whom he negotiated the purchase of the Whim II. Our conclusion that petitioner engaged in the charter activity primarily for profit is also based on the following factors. We are persuaded that petitioner conducted a reasonable investigation of the profit potential in chartering before making his investment. His testimony that he investigated a number of boat brokers and charter operators, including a trip to a boat yard in Florida, was credible and uncontroverted. Petitioner chose to invest in the Whim II for a number of reasons, all of which indicate that profit potential was his primary motivation. First, the Whim II was a top-of-the-line showboat already completely outfitted for the charter business. Petitioner considered the fact that the Whim II had a proven charter record and an established clientele to be major pluses. Secondly, the Whim II would be chartered out of Dickerson's facilities which were located very near petitioner's own home on Chesapeake Bay. Thus, petitioner could personally monitor the charter operation and hopefully minimize expenses by attending to maintenance *168 and upkeep himself whenever possible. Finally, petitioner was able to negotiate a favorable management agreement with Dickerson under which he was guaranteed a minimum level of revenue and which incorporated incentives to encourage Dickerson to maximize charter revenues. Both of these features were unusual in Dickerson management agreements and were secured by petitioner only after hard bargaining. Respondent argues that petitioner's failure to produce any cash flow projections on which he based his investment decision indicates a lack of profit motive. However, we found petitioner's claims that he prepared but discarded a "pro forma" projection of income and expenses from operation of the Whim II to be credible. Petitioner testified that he expected to generate approximately $ 12,000 of charter revenue per season. Based on 1983 charter rates, the Whim II would have to be chartered approximately 21 weeks to generate this amount of revenue for petitioner. Such a projection appears to be within reason. Petitioner also testified that based on his experience with his personal boat, he anticipated that maintenance fees would run approximately $ 3,000 per season. Thus petitioner calculated *169 a positive cash flow of approximately $ 9,000 per charter season before interest charges. Respondent further argues that petitioner's projections indicate he could not possibly have anticipated earning a profit when interest charges on the loan taken to purchase the boat are take into account. However, we found credible petitioner's testimony that he did not consider interest charges in his profit projections since he intended to quickly pay off the loan. The loan was not secured by the boat and petitioner apparently had sufficient assets to discharge the debt at any time. Respondent also questions petitioner's assertion that he also hoped to earn a profit through appreciation in the value of the Whim II. [10] Petitioner based his belief in the appreciation potential of his yacht on the general belief in boating circles that sailboat values were appreciating due to increasing oil prices, [11] *171 and his own experience with his 35-foot Pearson which had appreciated during petitioner's ownership. Respondent's expert witness conceded that Pearson boats had been appreciating but attributed this to special characteristics of the Pearson boats which were not present in other boats. Assuming *170 without deciding that respondent's expert was correct in his conclusion that appreciation in value was occurring only in Pearsons and not among sailboats in general, we do not consider information as to which particular boat models were appreciating to necessarily be within the knowledge of the typical layman as opposed to an expert. Petitioner owned a Pearson sailboat which had appreciated during his ownership. Under these circumstances we consider his belief that the Whim II would also appreciate to be bona fide. Our conclusion is buttressed by the fact that the Whim II was a special boat, having been built for one of the owners of the boat yard as an example of his company's workmanship. Respondent argues that petitioner was primarily motivated by a desire to use the tax losses generated through his charter activities to shelter a portion of his substantial income from other sources. However, petitioner's actions in discontinuing operations after less than one charter season and putting the boat up for sale indicate that tax motives were not uppermost in petitioner's mind. [12] *172 Had petitioner been primarily interested in reaping tax benefits he would certainly have held the yacht longer than the one charter season he did, before offering it for sale. Respondent further argues that petitioner purchased the boat for personal pleasure. Respondent primarily relies on the clause in the management agreement allowing petitioner up to two weeks personal use of the boat. However, Mr. Karr, the salesman with whom petitioner negotiated the sale of the boat, testified that they never discussed the personal use provision during their negotiations. Additionally, the Whim II was too large a boat for petitioner to handle alone. Petitioner's testimony in this regard is corroborated by both Messrs. Karr and Mason. Finally, during both of the years at issue petitioner had his other boat, the Pearson 35, for his personal use. We thus hold that personal pleasure or recreation played no part in petitioner's decision to purchase the Whim II. Petitioner's conduct during the brief period he was engaged *173 in charter activities is also indicative of profit motivation. Petitioner closely monitored Dickerson's performance of its obligations under the management agreement. In fact, petitioner's trips to the boat yard where the Whim II was docked became so numerous that Dickerson personnel soon came to view his presence at the yard as a nuisance. A high level of personal involvement in an activity is indicative of a profit motive. See sec. 1.183-2(b) (3), Income Tax Regs.
Finally, the most important factor evidencing petitioner's profit motive in entering the charter business is the speed with which he ceased operations once he determined that they would not be profitable. Petitioner soon realized that maintenance costs for a charter boat would be much higher than his estimates, which were based on maintenance costs he had experienced on his personal boat. As soon as petitioner came to this realization he sought to terminate his relationship with Dickerson and made plans to sell the boat. In sum, we conclude that petitioner engaged in his charter activities during the years in issue with the primary objective of earning an economic profit therefrom. Petitioner's prompt withdrawal from *174 the charter business when it became clear to him that he could not operate the boat profitably indicates that petitioner was primarily interested in a profitable charter operation rather than in using losses from the charter activity to offset other income. Nor was personal pleasure or recreation a motive in petitioner's purchase of the yacht. Accordingly, we hold that section 183 does not apply to limit petitioner's deductions from the chartering activity. 2. Investment Tax Credit Issue
Section 38 provides that a credit against income tax is allowed to a taxpayer for qualified investment in certain property. The credit is equal to 10 percent of such qualified investment. Sec. 46(a). The credit is allowable for property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and which has a useful life of 3 years or more. Sec. 48(a)(1). However, if the original use of otherwise qualifying property does not commence with the taxpayer, the cost of such property which is considered a qualified investment shall not exceed $ 125,000. Sec. 48(c) (2). Our determination that petitioner's yacht chartering activity was engaged in with the primary objective *175 of making a profit (i.e., that petitioner was engaged in a trade or business or an activity engaged in for the production of income) is thus dispositive of the issue of petitioner's entitlement to an investment tax credit on the yacht. However, the original use of the yacht did not commence with petitioner. Thus, only $ 125,000 of the yacht's $ 135,000 purchase price is a qualified investment. We thus hold that petitioners are limited to an investment tax credit of $ 12,500 in 1982 on this yacht. 3. Other Issues
The additions to tax for substantial understatements of tax liability pursuant to section 6661 and the increased rate of interest for substantial understatements of tax attributable to tax motivated transactions under section 6621(c) were both based on disallowance of petitioner's losses from his yacht chartering activity under section 183. Thus our determination that petitioner's yacht chartering activity was engaged in with the primary objective of making a profit is dispositive of these issues in petitioner's favor. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. References to petitioner in the singular are references to Edwin B. Feldman.↩
3. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c) (1) (A)-(c) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750. ↩
4. There were two entities involved in the Dickerson operation. Dickerson Boat Builders, Inc. was the boat builder. Dickerson Bay Charters, a division of Dickerson Boat Builders, Inc. entered into agreements with some purchasers of Dickerson boats to serve as their charter agent. 5. As per the agreement; of course there is no such date as "November 31." ↩
6. The parties also entered into a "Lease Agreement" concurrently with the Management Agreement described above. The two agreements were in all respects identical except that the Management Agreement contained an additional clause allowing the owner to reserve use of the yacht for up to two weeks at his option. ↩
7. The weekly charter fee for the yacht during 1983 was $ 1,150 and the daily rate was approximately $ 200. 8. During the 1983 charter season, Dickerson billed petitioner for $ 2,771.05 of maintenance and repair charges. ↩
9. Sec. 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether an activity is engaged in with the requisite profit motive. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Benz v. Commissioner,63 T.C. 375, 382↩ (1974). 10. We consider the use of the boat for charter activities and the holding of it for appreciation to be a single "activity" within the meaning of sec. 183. See Dickson v. Commissioner,T.C. Memo. 1983-1923↩. 11. Increasing oil prices contributed to the increased value of sailboats in several ways. First, increased fuel costs made power boats more costly too operate. This led to a shift in demand away from power to sail which led to increased sailboat prices. Second, fiberglass, the principle raw material in boat construction, is a petroleum-based product. The increased raw material costs also contributed to increased prices for both new and used boats. 12. We view petitioner's testimony as to his almost complete lack of knowledge as to the tax laws with skepticism. Petitioner claimed complete ignorance as to the investment tax credit and very little knowledge of tax depreciation. Yet in a September 8, 1984 letter to a prospective purchaser he states that he purchased the boat "as an investment with a tax shelter capability." Also in an April 17, 1986 written statement made in preparation for audit, petitioner acknowledges that he knew from the outset that the yacht was depreciable over a five-year period for Federal tax purposes. Nevertheless, although petitioner appears to be more knowledgeable about the tax considerations inherent in his yacht investment than he cares to admit, such considerations were secondary to his primary motive of making a profit.