**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-1665**

---

CSABA L. MAGASSY; FRANCES H. MAGASSY,

                                   Petitioners - Appellants,

       versus

COMMISSIONER OF INTERNAL REVENUE,

                                   Respondent - Appellee.

---

Appeal from the United States Tax Court.  (Tax Ct. No. 01-11982)

---

Argued:  May 25, 2005                Decided:  July 26, 2005

---

Before WIDENER, WILKINSON, and NIEMEYER, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Robert Doran Grossman, Jr., Las Vegas, Nevada, for Appellants.  Samuel Ashby Lambert, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee. **ON BRIEF:** Eileen J. O'Connor, Assistant Attorney General, Bruce R. Ellisen, UNITED STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Taxpayers Csaba and Frances Magassy appeal from a decision of the Tax Court upholding a determination by the Commissioner of Internal Revenue of deficiencies in their federal income taxes for the years 1995, 1996, and 1997. The Tax Court denied the Magassys deductions they claimed for expenses related to the operation of their 108-foot motor yacht during the years 1995, 1996, and 1997 and for the loss incurred from the sale of the yacht in 1997. The Tax Court concluded that under § 183 of the Internal Revenue Code, the Magassys did not have an "actual and honest objective" of making a profit in operating and selling the yacht, and that under § 1231 of the Internal Revenue Code, the yacht's chartering activity prior to its sale did not constitute a "trade or business." Finding no error in the Tax Court's decision, we affirm.

I

Csaba Magassy and his wife, Frances Magassy, of Potomac, Maryland, filed joint tax returns for the years 1995, 1996, and 1997. During the relevant years, Csaba Magassy was engaged in a successful plastic surgery practice in the Washington, D.C. area, and Frances Magassy was engaged as a housewife. In their income tax returns, the Magassys deducted from their ordinary income $602,605, $1,137,377, and $454,678, respectively, in losses from the operation of their yacht. In addition, they deducted

$1,931,292 from their 1997 ordinary income based on the loss they incurred from the yacht's sale. The Commissioner disallowed these deductions and sent the Magassys a notice of deficiency on June 25, 2001, citing income tax deficiencies of $245,790, $364,462, and $989,450 for 1995, 1996, and 1997, respectively. The Commissioner based the disallowances on Internal Revenue Code ("I.R.C.") §§ 162, 183, and 280A.

The Magassys (hereafter "Taxpayers") appealed this determination to the Tax Court, and after a two-day trial at which the parties called thirteen witnesses, the Tax Court issued a decision in favor of the Commissioner. The Tax Court denied Taxpayers the annual expense deductions under I.R.C. § 183 and analyzed the 1997 loss-on-sale deduction under I.R.C. § 1231. With respect to the expense deductions, the Tax Court observed that Treasury Regulation § 1.183-2(b) sets out nine nonexclusive factors for consideration, see 26 C.F.R. § 1.183-2(b), and proceeded to address each factor, apply the circumstances of Taxpayers' case, and resolve the factor against Taxpayers. The court ultimately concluded that Taxpayers had no actual and honest objective of making a profit in owning, operating, and selling the yacht during the tax years in question. Consistent with this conclusion, the court then found that the chartering activity leading up to the vessel's sale did not constitute a trade or business for purposes of I.R.C. § 1231.

The underlying facts were undisputed. Dr. Magassy purchased the yacht -- a 1963 108-foot Feadship -- in 1990 after Mark Mogul, a real estate broker who worked for Dr. Magassy's brother-in-law's real estate firm, Legum & Norman, had presented Dr. Magassy with the opportunity. Mark Mogul's father, Lee Mogul, owned a yacht brokerage firm in Fort Lauderdale, Florida, that was offering the yacht for sale. The Moguls told Dr. Magassy that the vessel was available for $1.625 million and presented him with a survey conducted by American Marine Surveyors, dated February 28, 1990, which listed the yacht's fair market value at $2.4 million and its replacement cost at over $9 million. The report from American Marine Surveyors noted that the survey was conducted while the vessel was afloat and that when the vessel was last hauled out of the water, the hull was "Audio Gauged and [it] indicated no appreciable wastage to the steel hull."

Shortly after learning of the opportunity, Dr. Magassy executed a contract to purchase the yacht from Lee Mogul's brokerage, Boats, Yachts & Ships, for $1.625 million and subject to specified contingencies. The parties also executed a separate agreement reducing the purchase price to $1.3 million and providing that the "sales price include[] the total and complete refurbishment of [the] vessel at approximately $300,000." Thus, $300,000 of the $1.3 million was to go to refurbishment of the yacht. The contract and separate agreement also provided for the

payment of a $78,000 fee to Legum & Norman by Boats, Yachts & Ships; an exclusive listing with Boats, Yachts & Ships and Legum & Norman for any resale of the yacht; and payment to William Norman (Dr. Magassy's brother-in-law) and Mark Mogul of 25% of any net profits realized from such a sale.

Dr. Magassy never personally inspected the yacht prior to closing. Instead, Norman traveled to Florida and reported back that the yacht was "terrific, . . . looks great." But Dr. Magassy did obtain an additional survey, which was conducted by Alexander & Associates on May 9, 1990, also while the vessel was afloat. The survey stated that the yacht's market value was $1.85 million, its fully restored value was $3.2 million, and its replacement cost was $8.7 million.

Closing on the purchase of the vessel occurred on May 29, 1990, at which time Dr. Magassy also closed on a $1 million loan from NCNB National Bank of Florida. As of May 29, however, Boats, Yachts & Ships apparently did not yet own the yacht. Lee Mogul purchased the yacht for Boats, Yachts & Ships on May 30 for $1 million, and its seller was required to pay the brokerage a $245,621 commission.

The vessel thereafter remained in Lee Mogul's care until the end of January 1991. Dr. Magassy saw the yacht for the first time in July 1990, when he discovered that it was in a state of total disrepair. Upon returning in November 1990, Dr. Magassy

-5-

found that little progress had been made on its restoration, and he learned from Lee Mogul that the full $300,000 designated for restoration work had been spent. Having lost confidence in Mogul, Dr. Magassy decided to have the yacht moved to Angus Shipyard in Bayou La Batre, Alabama, for continued restoration work.

In July 1991, Dr. Magassy filed suit against Lee Mogul, Mark Mogul, and Boats, Yachts & Ships to recover the $300,000 intended for repairs, alleging breach of contract, unjust enrichment, and conversion. Dr. Magassy, however, was never able to effect service on the defendants. Moreover, in October 1991, the Florida Secretary of State administratively dissolved Boats, Yachts & Ships.

At Angus Shipyard, the vessel was removed from the water and extensive hull deterioration was discovered. Despite Angus' initial estimate for restoration work of $218,000, by November 1991, Dr. Magassy had already paid $428,648 and had been billed for an additional $527,637. When Dr. Magassy refused to pay, Angus Shipyard filed a maritime lien against the vessel and a suit in federal court to enforce the lien. The parties ultimately settled the suit in November 1992, with Dr. Magassy paying Angus Shipyard $300,000 in cash and giving it a $180,000 promissory note.

In May 1992, Dr. Magassy's accountant referred him to a law firm for tax advice regarding the sale of the yacht, since by then "[t]he combined acquisition and refurbishing costs of the [yacht]

substantially exceed[ed] the boat's fair market value." The law firm prepared a memorandum analyzing whether a loss realized on the sale of the yacht could be treated as a "§ 1231 loss" -- that is, whether the loss could be treated as an ordinary loss and used to offset Taxpayers' unrelated ordinary income. The memorandum concluded that "[i]n order to qualify for section 1231 loss treatment, Dr. Magassy would be required to commence a boat chartering business and use the [yacht] in that business prior to the sale."

Following this advice, in December 1994, Dr. Magassy created S.M.S.M., Inc., a Florida subchapter S corporation, of which he was the sole shareholder and director and his wife was the secretary-treasurer, and he registered the corporation as a sales and charter boat dealer. Weeks later, he listed the yacht for sale with Richard Bertram Yachts for $2.4 million. The following March, he transferred the yacht's title to S.M.S.M., and S.M.S.M. borrowed $874,000 to refinance and pay off the NCNB purchase-money loan. Also during this period, S.M.S.M. signed an agreement with Priscilla Yacht Management, whereby the yacht became part of Priscilla's charter fleet, and the yacht was subsequently featured in a number of print advertisements in chartering magazines. S.M.S.M. maintained separate checking and credit card accounts, and, starting in 1996, an employee of Dr. Magassy's medical

practice began keeping computerized records associated with the company.

From January 1995 until April 1997, the yacht was chartered to paying customers approximately 20 times. It was chartered twice to Plastic Surgery Associates, Dr. Magassy's medical practice. And members of the Magassy family used the yacht on numerous other occasions. Dr. Magassy's two sons were aboard the yacht during two March 1995 sea trials and a June 1995 charter by Plastic Surgery Associates. One of his sons was also aboard during a July 1995 charter. Dr. Magassy's daughter was aboard during one of the March sea trials. Mrs. Magassy was aboard during the first March sea trial, and both she and Dr. Magassy were aboard during the second sea trial, which was a four-day trip from Fort Lauderdale, Florida to Hurricane Hole, Bahamas. On at least three additional occasions, different Magassy family members took personal vacations on board the yacht while it was in the Bahamas. On a number of occasions Taxpayers held dinner cruises and cocktail parties on the vessel, and on other occasions, members spent daytime and evening hours partying on the yacht without staying overnight.

In April, 1997, Dr. Magassy sold the yacht for $1.1 million, realizing a substantial loss.

Taxpayers contend that the Tax Court erred in several respects. First, Taxpayers argue that the Tax Court applied the wrong legal standard to determine whether they had a profit motive under I.R.C. § 183. They assert that the Tax Court's language reveals that it applied a "reasonable man" standard, erroneously asking whether Taxpayers were reasonable to expect to make a profit, rather than whether they actually and honestly had the objective of making a profit. Second, Taxpayers contend that the Tax Court clearly erred in its factual finding that they lacked a profit motive. In particular, they assign error to (1) the Tax Court's application of the nine Treasury regulation factors; (2) its failure to specify the exact point at which they lost their profit motive, which the Commissioner conceded existed in 1990; (3) the Tax Court's consideration of the ownership and operation of the vessel as discrete activities in the profit motive analysis; and (4) its use of the fact that they listed the yacht for sale at a loss as an indication of a lack of a profit motive. Finally, Taxpayers assert that the exclusion of some of Dr. Magassy's testimony on hearsay grounds was an abuse of discretion.

A

Taxpayers first argue that "[t]he key issue for resolution by [the court of appeals] is whether the Tax Court employed and applied the proper legal (profit motive) standard in

deciding the case." Noting that I.R.C. § 183 commands an inquiry into whether Taxpayers had "an actual and honest objective of making a profit," rather than whether a reasonable person would have expected such a profit, they contend that the Tax Court in this case erred by employing a "reasonable person" standard.

Internal Revenue Code § 183, the "hobby loss" provision, limits deductions from activities not engaged in for profit to the extent of gross income derived from such activities. 26 U.S.C. § 183(b). Activities by an individual or a subchapter S corporation, however, that are in fact engaged in for profit, are not subject to that limitation, and losses incurred from such activities are deductible from the taxpayer's ordinary income under I.R.C. §§ 162 and 212. See 26 U.S.C. §§ 183(a), 183(c).

The key under § 183(b) to whether a taxpayer may deduct losses from ordinary income generally lies in the determination of whether the taxpayer had a profit motive in engaging in the activity. The starting point for addressing that question is Treasury Regulation § 1.183-2 which provides in part:

> The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. . . . In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent.

-10-

26 C.F.R. § 1.183-2(a); see also Faulconer v. Commissioner, 748 F.2d 890, 894-902 (4th Cir. 1984) (applying § 1.183-2(a)).

Taxpayers in this case contend that various statements that the Tax Court made in its opinion employing the term "reasonable" indicate that the court ignored the proper legal standard. Our review of those statements, however, leads us to conclude that, far from evidencing the employment of an erroneous standard, the Tax Court's statements show its faithful application of Treasury Regulation § 1.183-2(a) and Faulconer. The Tax Court was required to refer to "objective standards" and determine whether "the facts and circumstances" of Taxpayers' case actually supported the asserted profit objective. 26 C.F.R. § 1.183-2(a); Faulconer, 748 F.2d at 894. And the Faulconer Court made clear that "[a] taxpayer's mere statement of intent is given less weight than objective facts." 748 F.2d at 894. Taxpayers, instead, would have the court blindly adopt their assertions of intent as sacrosanct. Such an interpretation of the standard is contrary to precedent and the regulations. We conclude, accordingly, that the Tax Court properly applied the governing legal standard in its I.R.C. § 183 analysis.

B

Taxpayers next contend that the Tax Court improperly found as fact that they lacked a profit motive. We review these

-11-

findings for clear error.  See Hendricks v. Commissioner, 32 F.3d 94, 97 (4th Cir. 1994).

According to Treasury Regulation § 1.183-2(b), "[i]n determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account," and "[n]o one factor is determinative."  26 C.F.R. § 1.183-2(b).  In addition, the regulation sets out nine factors for consideration, although "it is not intended that only [those] factors . . . are to be taken into account in making the determination, or that a determination is to be made on the basis [of] the number of factors" supporting a conclusion.  Id.  In other words, the regulation intends to be a wide-ranging qualitative analysis.  See Faulconer, 748 F.2d at 896-902 (applying the factors).  The listed factors, "which should normally be taken into account," are:

(1) Manner in which the taxpayer carries on the activity. . . .

(2) The expertise of the taxpayer or his advisors. . . .

(3) The time and effort expended by the taxpayer in carrying on the activity. . . .

(4) Expectation that assets used in activity may appreciate in value. . . .

(5) The success of the taxpayer in carrying on other similar or dissimilar activities. . . .

(6) The taxpayer's history of income or losses with respect to the activity. . . .

-12-

(7)  The amount of occasional profits, if any, which are earned. . . .

(8)  The financial status of the taxpayer. . . .

(9)  Elements of personal pleasure or recreation. . . .

26 C.F.R. § 1.183-2(b).  In addition, "at all times, the taxpayer has the burden of showing that the activity was engaged in for profit."  Hendricks, 32 F.3d at 98.

In its opinion, the Tax Court addressed each of the nine factors and concluded that, based on the facts, each suggested the absence of an actual and honest profit motive by the Taxpayers.  As to factor (1), the Tax Court found that the Taxpayers' endeavor was not conducted in a businesslike manner:  no business plans or restoration budget was ever produced; no reasonable investigation was made; and the restoration work was not properly monitored.  As to factor (2), the court found that Taxpayers had no experience in owning or investing in yachts and that those they relied on as "experts" were all interested parties.  As to factor (3), the Tax Court noted Taxpayers' lack of time devoted to the restoration and chartering of the yacht.  As to factor (4), the Tax Court stated that even though Taxpayers might have had an expectation in 1990 that the yacht would appreciate in value, by 1995 any such expectation had evaporated, given the price at which the yacht was listed for sale in 1994.  As to factor (5), the Tax Court noted Taxpayers' lack of any former experience in yacht chartering or restoration.   As  to  factor  (6),  the  Tax  Court  observed  that

-13-

S.M.S.M. incurred substantial and mounting losses, year after year, and that there was no way by which Taxpayers could honestly have expected to generate positive net income from the chartering activities. In addition, the Tax Court observed that the yacht was listed for sale at a price at which it would have been impossible for Taxpayers to have generated any income. As to factor (7), the Tax Court noted the existence of continuing losses from chartering the yacht and the impossibility of Taxpayers' profiting from the yacht's sale. As to factor (8), the Tax Court pointed to Taxpayers' substantial income from sources other than the loss-producing activity to "indicate that the activity [was] not engaged in for profit[,] especially if there [were] personal or recreational elements." 26 C.F.R. § 1.183-2(b)(8). The court noted that the significant losses of S.M.S.M. served to shield Taxpayers' unrelated income from taxation. And as to factor (9), the Tax Court noted the inherent recreational element involved in the ownership of a luxury motor yacht. These findings are amply supported by the record, and we hold that they appropriately lead to the conclusions under Treasury Regulation § 1.183-2(b) that the Tax Court reached.

Taxpayers contend that in applying these factors, the Tax Court was required to have identified the exact moment between 1990 and 1995, at which they lost their profit motive. While Taxpayers correctly note that the Commissioner conceded their genuine and

-14-

honest profit motive in acquiring the yacht in 1990, they themselves concede that "every tax year presents a new and different cause of action." In this case, the Tax Court correctly considered the factors relevant only to the three years for which the Commissioner denied the deductions.

Taxpayers also argue that the Tax Court erroneously failed to consider ownership and operation of the vessel as a single activity. They argue that if the ownership and operation of the yacht are viewed together, their profit motive for the sale of the vessel rendered any lack of profit motive for the chartering operations irrelevant. This argument, however, flies in the face of the facts of this case. There is no evidence to support a profit motive for the sale of the vessel because by 1995, Taxpayers had listed the vessel for sale at a price that made it impossible for them to realize a profit.

Taxpayers respond to this observation by contending that listing the yacht for sale at a loss was not inconsistent with their having a profit motive because "profit" in this case "is synonymous with capital preservation." Their only support for this argument, however, is Feldman v. Commissioner, 55 T.C.M. (CCH) 450 (1988), and that case is not on point. In Feldman, a case involving the application of I.R.C. § 183 to a taxpayer's ownership and chartering of a sailboat, the Tax Court merely stated that "petitioner's actions in discontinuing operations after less than

-15-

one charter season and putting the boat up for sale indicate that tax motives were not uppermost in petitioner's mind."  Id. at 454. "Had [Feldman] been primarily interested in reaping tax benefits," the Tax Court continued, "he would certainly have held the yacht longer than the one charter season he did, before offering it for sale."  Id.  That, however, is exactly what Taxpayers did in this case.  They continued to refurbish, operate, and charter the yacht at a loss, knowing that they would never be able to recoup those losses at the time of the yacht's sale.

For all of the reasons stated, we conclude that the Tax Court did not clearly err in its findings of fact under I.R.C. § 183.

C

Finally, Taxpayers argue that the Tax Court erroneously excluded certain of Dr. Magassy's testimony on hearsay grounds. According to Taxpayers, this testimony should have been admitted to establish Dr. Magassy's actual and honest belief regarding profit motive.

While Taxpayers' attorney was questioning Dr. Magassy as to his conversations with Lee Mogul about chartering the yacht, the attorney asked, "Do you remember how many weeks he said, for the chartering?"  The Commissioner objected, and the Tax Court sustained the objection on hearsay grounds.  Dr. Magassy then testified that, based on his conversations with Lee Mogul, he

-16-

thought the chartering was "[v]ery doable" -- that is, profitable. The attorney then asked him if Lee Mogul "[told] [him] it was doable?" And the Tax Court sustained the Commissioner's objection to that question as well. Taxpayers argue that "[p]reventing [Dr. Magassy] from testifying as to what was in his mind, which is the only relevant issue, prevented the Tax Court from making a proper factual finding."

But Taxpayers' attorney never asked that the testimony be admitted only for the purpose of showing Dr. Magassy's state of mind. Moreover, Dr. Magassy was permitted to testify to his state of mind -- that he, based on his conversation with Lee Mogul, thought that the chartering business could be profitable. The Tax Court's evidentiary rulings did not amount to an abuse of discretion.

III

Taxpayers failed to address directly the Tax Court's disallowance of their deduction of the loss from the sale of the yacht in 1997. The deductibility of that loss is governed by I.R.C. § 1231, which creates an even higher hurdle for Taxpayers than does I.R.C. § 183. Internal Revenue Code § 1231 allows a net gain to be treated as a long-term capital gain, but allows a net loss to be deducted from ordinary income. See 26 U.S.C. § 1231(a)(1), (a)(2). To qualify under I.R.C. § 1231, however, the gain or loss must have been recognized "on the sale or exchange of

-17-

property used in [a] trade or business." 26 U.S.C. § 1231(a)(3)(A)(i) (emphasis added); id. § 1231(a)(3)(B).

The Tax Court noted that "[i]n analyzing whether an activity in connection with which property is sold constituted a trade or business (for purposes of ordinary loss treatment under section 1231), a taxpayer's profit objective, or lack thereof, relating to the activity is particularly significant." The court went on to conclude, "because of the lack of profit objective associated with the charter of the [yacht], the charter activity relating to the [yacht] . . . did not constitute a trade or business, and the [yacht] does not qualify for treatment as trade or business property under section 1231."

Because the Tax Court correctly determined that Taxpayers lacked a profit motive in operating and chartering the yacht, as we have already noted, it must follow that the chartering activity does not qualify as a trade or business under I.R.C. § 1231. As the Supreme Court stated in Commissioner v. Groetzinger:

> [N]ot every income-producing and profit-making endeavor constitutes a trade or business. . . . We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify.

480 U.S. 23, 35 (1987); see also Helvering v. Highland, 124 F.2d 556, 561 (4th Cir. 1942) (noting that "the profit motive and presence of business-like policies should be given great weight" in

-18-

determining whether an activity qualifies as a trade or business).

Thus, we conclude that the Tax Court did not err in its application of I.R.C. § 1231.

<u>AFFIRMED</u>