REGALADO T. MARY and MILAGROS D. MARY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mary v. Commissioner
Docket No. 35518-86
United States Tax Court
T.C. Memo 1989-118; 1989 Tax Ct. Memo LEXIS 118; 56 T.C.M. (CCH) 1515; T.C.M. (RIA) 89118; March 23, 1989
Philip D. Caloger, for the petitioners. Marjory A. Gerdes, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in separate statutory notices of deficiency dated July 2, 1986, determined deficiencies in income tax of $ 56,477.50 and $ 84,499.50 for 1983 and 1984, respectively, and additions to tax under section 6661[1] in the amounts of $ 5,647.75 and $ 8,449.95 , respectively. Respondent, by means of his answer, also seeks additional interest under section 6621(c) for both taxable years. The issues presented for our consideration *120 are: (1) Whether petitioners' horse racing activity was "for profit" within the meaning of section 183; (2) whether petitioners' 1983 gross receipts from horse racing activity should be increased $ 3,545 from the amount reported; (3) whether petitioners' claimed interest expense deduction for 1983 should be reduced by $ 2,125 ; and (4) whether petitioners are liable for additions to tax under section 6661 and additional interest under section 6621. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of the petition, Regalado T. and Milagros D. Mary were husband and wife and resided at Chicago, Illinois. (Singular reference to "petitioner" will denote Regalado T. Mary). Petitioners were born in the Philippines during the early 1940's and remain citizens of the Philippines. Petitioner obtained a medical degree in the Philippines and came to the United States during 1968. He interned in Cincinnati, Ohio, and served his residency at Vanderbilt University, Nashville, Tennessee (1970-1971), and Northwestern Hospital, Chicago, Illinois *121 (1972). Petitioner became a licensed anesthesiologist in 1972. Petitioner's wife obtained Masters degrees during 1968 in Political Science and Education from the University of Chicago and DePaul University, respectively. She worked as a social worker during 1969 and subsequently became Director of Admissions at Northwestern University until the birth of her first child in 1973. Petitioner served on a hospital staff from 1972 to 1974, when he and another doctor organized Northwest Suburban Anesthesiologists (Northwest), a "Subchapter C" corporation. During 1983 and 1984 petitioner was President and Chairman of Northwest and he owned 16.7 percent of the corporate shares. An office is maintained for Northwest and it has the customary checking account(s), books, records and financial statements. Rodrigo Lazaro (Lazaro) is the office manager of Northwest who is responsible for the daily financial management of the accounts and books. Robert N. Callero, C.P.A. (Callero), serves as accountant to Northwest. Callero prepares annual financial statements for Northwest. Petitioner, from 1974 through 1986, reported salaries and wages from Northwest, as follows: Year
Wages Reported
1974
$  72,929
1975
90,200
1976
88,250
1977
99,150
1978
122,250
1979
142,050
1980
157,771
1981
218,900
1982
313,667
1983
304,000
1984
333,417
1985
331,417
1986
346,920
*122 Petitioner also reported capital gains, in less significant amounts, during 8 of the above-listed years from transactions in shares of Northwest. Petitioner spends 5 to 6 days per week, 5 to 6 hours per day, [2] in his practice as an anesthesiologist. Petitioner first became interested in horse racing when he visited a race track during a medical convention. He bought his first horse in 1974, at a time when he did not have any prior experience with horses. From 1974 to 1987 petitioner has owned approximately 60 different horses, some by purchase and some by his breeding activity. During 1983 and 1984 petitioner had about 20 horses, including mares, foals and racing stock. About five of the horses were the subject of a fifty-fifty arrangement with petitioner's trainer, Gary Kreischer (Kreischer). A schedule of petitioner's purchases, accessions and sales of horses during the period 1974 through 1986 is attached to this opinion as "Appendix A." In addition *123 to purchasing and breeding horses, petitioner drives his own horses and had become a certified professional harness driver beginning in 1976, holding a type "A" license. He also holds a type "G" trainer's license. Petitioner spends about 50 to 70 hours per week in his breeding and racing activity. Petitioner's horse activity causes some dissension at home because it takes away from time he would have spent with his family. Generally, he begins his horse activity at 4:00 to 4:30 a.m. and then goes to his medical practice at about 7:30 to 8:00 a.m. After 5 or 6 hours at his medical practice, petitioner returns to his horse activity where he may be involved until as late as 10:00 to 11:00 p.m., if he races. When petitioner is on vacation from his medical practice he spends more time involved in his horse activity. Petitioner personally cares for the horses, cleans the stables, trains horses and races them. He also employs two trainers, a groom, an exercise boy and a stable boy to assist in his horse activity. Petitioner enjoys his horse racing and related activity. Petitioner prefers to buy mares, which, if they turn out to be poor racers, he uses for breeding purposes. Although *124 he has owned stallions they are not used for breeding purposes. Petitioner pays stud fees for breeding purposes. The average cost of maintaining a horse is about $ 10,000 to $ 12,000 annually. If horses do not win races or perform well as "good runners," petitioner will sell them "cheap" or even give them away to obviate the maintenance costs. Petitioner enters 400 to 500 races per year, about one-third of which are pari-mutuel races where a purse is offered for the winning horses. The remaining two-thirds of the races are called "schooling races" in which no purse is offered and the horse is raced for experience and to earn a reputation. Kreischer has been a trainer for 20 years and has worked 7 years for petitioner. Kreischer holds a type "G" trainer's certification or license. Kreischer considers petitioner to be an accomplished horse trainer and driver. Petitioner reported, on Schedule C, the following gross receipts, capital gains and losses, depreciation, net operating losses and tax credits related to his horse racing activity for the years 1974 through 1986: Capital
Gross
Gains &
Operating
Tax
Year
Receipts
(Losses)
Depreciation
(Losses)
Credits
1974
$    308
--  $    517
$ (  2,355)
$   115
1975
4,900
--  1,992
(  3,881)
140
1976
3,996
--  7,346
( 13,087)
1,005
1977
9,078
$ (   250)
7,748
( 19,653)
-- 1978
11,277
1,494 10,276
( 29,772)
-- 1979
11,509
11,901 16,285
( 24,722)
45
1980
15,489
--   12,996
( 22,221)
-- 1981
6,193
( 6,530)
10,707
( 55,470)
-- 1982
14,872
( 7,126)
17,050
( 63,593)
443
1983
55,789
1,374 35,795
( 98,169)
768
1984
37,962
(13,313)
46,398
(156,476)
-- 1985
59,404
9,138 34,024
( 93,310)
-- 1986
93,691
7,120 20,389
( 47,738)
-- *125 Petitioner maintains four checking accounts outside of the accounts maintained for Northwest. Expenses involving horse activity were paid from two of the four accounts, but all accounts were used for other and personal purposes of petitioners. Invoices, canceled checks, and bank statements are used for purposes of an informal single-entry bookkeeping system which is kept by Lazaro. Lazaro prepares monthly summaries of check and cash outlays relative to the racing activity. All income received is not deposited in petitioners' bank accounts and income from purses is, in part, compiled from reports filed with the Internal Revenue Service by Horseman's Guarantee Corporation of America and from petitioner's memory as periodically reported to Lazaro. On an annual basis, Callero prepares a Schedule C reflecting petitioner's horse activity for tax purposes. Although an informal system, petitioner's bookkeeping system and method of reporting income and expenses is generally sufficient to provide a basis for reporting his income and expenses from the horse activity. Sometime during 1974 petitioners purchased a second home in Barrington, Illinois, which had 10 acres of land and a barn *126 that could accommodate 10 horses. Subsequently, a small horse jogging track and fence was added. Petitioner, his wife and two children spent summer months at the Barrington property. During other times of the year the Barrington property was leased to others and rental income was received from the lessees and reported on petitioners' tax return. Petitioner's wife does not ride horses and his children are both allergic to horses. Until the Barrington property was sold during 1986, petitioner boarded, cared for and trained some of the horses used in his horse activity at the Barrington property. Petitioner has deducted depreciation and expenses connected with the use of the barn on his 1983 and 1984 tax returns. For example, petitioner claimed $ 1,304 as depreciation of the barn, along with improvements and the fences. Apparently, no other part of the Barrington property was claimed in connection with petitioner's horse activity. Petitioners sold the Barrington property in 1986 to reduce their overhead and upkeep expense and to achieve gain from the sale of the property. In this regard, race track operators did not charge petitioner to keep horses raced at the track and the sale *127 of Barrington would reduce operational costs. Purses for most of the "non-schooling" races in which petitioner competes range from $ 3,600 to $ 9,000 and are divided 50 percent, 25 percent, 12 percent, 8 percent and 5 percent to the first through fifth place winners, respectively. Although petitioner has generally not competed outside of Illinois, some "stake races" for harness horses approximate $ 350,000 to $ 500,000 . The largest stake race in Illinois is the "Orange and Blue" and petitioner has not competed in that race. The 1986 winner of the "Orange and Blue" received about $ 100,000. Stake race entry fees for petitioner's horses has approximated $ 2,000 per year per horse. Callero has discussed the financial aspects of petitioner's horse activity on a number of occasions. Callero suggested the sale of the Barrington property to cut costs. Callero prepares about 20 income tax returns annually involving horse racing activity. ULTIMATE FINDINGS OF FACT Petitioner, for the taxable years 1983 and 1984, engaged in horse breeding and racing activity with the objective of making a profit. Petitioners received $ 3,545 of racing income which was not reported on their 1983 *128 Federal income tax return. Petitioners are not entitled to $ 2,125 of the interest deductions claimed for 1983. OPINION The central issue presented is whether petitioner's horse racing was an activity not engaged in for profit. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. [3] An "activity not engaged in for profit" is defined by section 183(c) as any activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses) or section 212(1) or 212(2) (relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income). *129 Horse related activity may constitute a trade or business for purposes of section 162. Engdahl v. Commissioner,72 T.C. 659, 665 (1979). Whether it does or not depends on whether making a profit was the objective of the venture. Engdahl v. Commissioner, supra at 666; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). A taxpayer need not prove that he had a reasonable expectation of profit in order to establish that he engaged in the activity for profit; he must show, however, that he entered into or continued the activity with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). In determining the taxpayer's objective, greater weight is given to objective facts than to *130 the taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs.
All facts and circumstances that bear on the activity are to be taken into account in determining whether it was engaged in for profit. Sec. 1.183-2(b), Income Tax Regs. Included in the regulation are nine factors as among those that should normally be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. No single factor is controlling. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, supra at 720. *131 Respondent has addressed this issue by presenting argument on each of the factors set forth in the regulation and we choose to follow the same approach. 1. Manner in Which Activity Carried on
Here, respondent argues that petitioner was successful in his medical practice and that there is a disparity in the way that petitioner presented and carried on his racing activity. Respondent contends that petitioner's racing activity did not "have stationery printed [,] * * * a separate checking account" or formal records. Although there is clearly a difference between the manner in which petitioner runs his medical practice and horse racing, the difference does not render his racing activity as unbusinesslike. Petitioner's racing activity was his own proprietorship, which, generally, only affected him. Accordingly, the need for more formal records and statements is somewhat less important. In the medical practice, where petitioner owns less than 20 percent of the business entity, there is a need for more detailed and formal records in order to meet the needs of and satisfy the several shareholder-owners. More importantly, petitioner's monthly receipts and disbursements from *132 racing activity were summarized by a bookkeeper. On an annual basis, petitioner's accountant prepared the annualized profit and loss figures. Those figures were discussed and analyzed from a business point of view by petitioner and his accountant. An accounting technique is sufficient if it provides "at a minimum * * * the information [required] to make informed business decisions." Burger v. Commissioner,809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. Here, petitioner's horse racing accounting method was sufficient within the meaning of Burger v. Commissioner, supra.
2. The Expertise of the Taxpayer or His Advisors
Respondent correctly argues that petitioner did not have prior experience or expertise in horse racing or the underlying economics of horse racing and breeding. Respondent also argues that petitioner's accountant did not have experience in horse activity. Although petitioner did not have any experience when he became interested in horses in 1974, during the next 10 years he acquired expertise in all aspects *133 of horse care, training and racing. He also employed another licensed trainer with significant experience. "Efforts at gaining experience and a willingness to follow expert advice should * * * be considered" in determining profit objective. Nickerson v. Commissioner,700 F.2d 402, 407 (7th Cir. 1983). Petitioner's accountant, although without specific expertise involving horses, performed accounting services and tax return preparation for about a dozen horse racing entities. That background, along with his general accounting background, is sufficient to provide petitioner's accountant the ability to financially advise about horse-related business activity. Advice was provided that, in later years, resulted in reduced operating costs. 3. Time and Effort Expended in Carrying on Activity
On this point, respondent argues that petitioner's horse activities are essentially an avocation. In this regard, respondent contends that although petitioner spends a large amount of his time engaged in the horse activity, the time is spent for personal pleasure and recreation. *134 Petitioner actually spends more time on his horse activity than his medical practice. Considering the type of things that petitioner does (train, groom and race horses), the times of day and the number of hours engaged, we are unable to conclude that this activity is purely for pleasure or a hobby. See Faulconer v. Commissioner,748 F.2d 890 (4th Cir. 1984), revg. a Memorandum Opinion of this Court. Because the horse racing activity does not involve significant personal or recreational aspects (discussed below), we give weight to the great amount of time spent by petitioner in conducting the activity. Petitioner would not have to race 400 to 500 times per year if he sought pleasure or recreation. He would not have to breed horses or maintain as large a number of horses, if he merely sought pleasure or recreation. We are also swayed by the fact that his children are allergic to horses and his wife is not interested in horse activity. Cf. Schirmer v. Commissioner,89 T.C. 277 (1987), where the taxpayer's family spent several weeks each summer on taxpayer's farm. Additionally, rather than adding to his family life, petitioner-wife testified that *135 petitioner's activities took time away from his family and personal life. 4. Expectation that Assets May Appreciate in Value
Petitioner is involved in horse racing activity, not horse breeding. Petitioner's horse breeding and purchasing activity is directed at supplying trotters for racing purposes. Because he is not breeding horses for sale, he should not expect to dispose of many horses at a profit. In this regard, the fact that petitioner gives away or sells his unprofitable horses to reduce maintenance costs is more indicative of a profit motive. In addition, to the extent petitioner acquires or breeds horses which win purses, the horses will likely appreciate in value. Moreover, petitioner's record in horse trading can be described as moderately successful. Respondent argues that petitioner has sold only four horses for an amount greater than he paid for them and that the remainder of the sales were for less than cost or were given away without anything in return. The financial data stipulated by the parties reflects net capital gains and losses over the 12-year period, all of which net to an overall gain of $ 3,808. In this connection, the size and amount of capital *136 gains has steadily increased as petitioner becomes more experienced in his horse activity. Although not fully employed in petitioner's horse activity, the Barrington property did have a barn and jogging track for horses. That property was also used as a rental property and was eventually sold at a profit. Petitioner's racing and horse breeding activity are steadily improving reflecting petitioner's attempts and ability to earn a profit. 5. Success in Carrying on Other Activities
On this point, respondent again makes the comparison with petitioner's medical practice and its success. We have already addressed the question of the amount of record keeping and business trappings differences between the medical practice and horse activity. Before petitioner was permitted to offer his medical services, he was required to attend the university and serve an internship and residency. In a similar manner, petitioner has spent time developing and improving his racing and horse breeding activity to a point where success appears more likely. 6. History of Income or Losses Regarding Activity
Respondent argues that petitioner has never shown a profit from his horse racing activity. *137 Although that statement is correct, respondent failed to recognize that petitioner's gross income from racing is generally increasing and his cost of operations and expenses are generally decreasing. For 1986 petitioner's gross receipts from racing alone amounted to $ 93,691 and he also had net capital gains from horse activity of $ 7,120. The amount of depreciation claimed has also been generally decreasing and the ratio of receipts to expenses has been closing at a general rate which would, if projected, suggest that profits will be experienced from racing activity. Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). This is not the typical situation where the income remains nominal and the expenses and depreciation continue at a level much in excess of the income. It is also important to note that the majority of petitioner's claimed deductions are out-of-pocket expenses and not related to depreciation or other items for which a deduction is permitted without payment during the taxable year. Moreover, in some years the actual expenditures would represent a relatively large percentage of petitioner's *138 income from his medical practice. The facts of this case reflect that petitioner has gone beyond the point where he could be considered as merely supporting a hobby or pastime. 7. Amount of Occasional Profits Earned
"[T]he presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation * * *." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Respondent here focuses upon his contention that "Petitioner has never earned a profit with his horse racing activity." Initially, we note that petitioner did earn capital gains in connection with his horse activity. Although petitioner has not earned operating profits, his activity is clearly not static and gross receipts are generally increasing and expenses and depreciation decreasing. Petitioner's situation during the years under consideration is one which shows business and profit motivated efforts. The standard does not require some profits before losses may be deductible, but requires *139 the taxpayer to make honest and effective efforts to make a profit. The record in this case reflects that petitioner is attempting to make a profit, even though no operating profits had been experienced as of 1983 and 1984. 8. Financial Status of Taxpayer
Respondent points out that petitioner earned substantial income from sources other than the horse activity and that may indicate that the horse activity is not for profit. Petitioner does earn substantial income from his medical practice (over $ 300,000 in 1983 and 1984), but he has also expended large sums on his horse activity apart from depreciation and has not attempted to deduct what otherwise would be personal living expenditures as business or horse activity related. Moreover, petitioner does not appear to be supporting a hobby from his medical earnings. His activities are substantial in relation to his medical practice earnings and petitioner's family is not receiving benefits from the expenditures because the expenditures reduce their spendable income by more than they provide any benefit from reductions of taxable income. 9. Elements of Personal Pleasure or Recreation
Most of the "section 183 hobby *140 loss" cases involve some activity which could be considered recreational. Clearly, horse riding or racing fits within that category of cases. Factually, it is our responsibility to decide in which of these cases there was an "actual and honest objective of making a profit." Although petitioner certainly obtained some personal pleasure and recreation from his horse activity, the circumstances of this case, as discussed above, cause us to conclude that petitioner's activities were profit motivated. "We think it unlikely that [petitioner] would embark on a hobby costing thousands of dollars and entailing much personal physical labor without a profit motive." Engdahl v. Commissioner,72 T.C. 659, 670 (1979). Respondent also determined that petitioners' 1983 tax return did not include $ 3,545 in additional income and that petitioners' interest expense deduction was overstated by $ 2,125. Petitioners offered no evidence on these issues and did not address them in their briefs. We, therefore, conclude that petitioners either intended to abandon or concede these issues. Due to the lack of evidence to carry their burden of proof of showing that respondent's determination *141 was in error, we hold that petitioners had additional income from horse activity of $ 3,544 and that their interest expense deduction should be reduced by $ 2,125, both for the taxable year 1983. Respondent also determined additions to tax under section 6661 for both taxable years. It appears that our holding on the primary section 183 issue would mathematically cause petitioners' tax situations for 1983 and 1984 to not fit within the threshold requirements of section 6661 and we leave the parties to address that aspect in their Rule 155 computations. Concerning respondent's determination that petitioners are liable for additional interest under section 6621(c) for both taxable years, our holding that petitioners' losses are allowable and that the restrictions of section 183 do not apply to petitioners obviates respondent's section 6621 determination. Respondent's section 6621(c) determination was based upon the disallowance of deductions from horse activity under section 183. Moreover, we find that petitioner's horse activities were not tax motivated within the meaning of section 6621 for the taxable years 1983 and 1984. To reflect the foregoing, Decision will be entered *142 under Rule 155.
APPENDIX A
date
date
Horse [1]
purchased [2]
sold [3]
cost [4]
sale price
Truella
Time (1/2)
9/74
79 or 80 $  3,600
[5] $    -0-
Shadow
Delight
11/75
5/78     4,200
2,500
Jibo Harry
4/76
81 or 83 5,500
[6] -0-
Nu Miss
Magic
10/76
/85      2,333
[7] -0-
Possum
Dust
1/77
81 or 83 500
-0-
Far Below
Par
1/77
/83      600
-0-
Lauder
Lumber
8/78
[8] /81     23,000
-0-
Total
Travel
10/78
9/79     10,000
17,500
Miss Roman
Nose
5/79
foal Clever
Bear
11/79
/81     5,000
500
Radar Mac
11/79
/81     1,500
500
Lobe Girl
9/79
/85     1,500
-0-
Riverview Gare
4/80
/82     3,525
750
Truella
Time's foal [9]
6/80
3,000
-0-
Lela Mae
9/80
1/83     2,000
-0-
Away Magic
4/82
foal Buck Three
Eighty
6/82
/82     foal -0-
Dancing Dame
/81
1/83     5,000
-0-
Fool-A-matic
/81
/82     3,500
350
Total Travel [10]
/81
/82     7,000
750
Hurricane Belle
/81
1/83     3,000
-0-
Miss Marla
/81
/83     1,500
-0-
Touch of Class
/81
/83     foal -0-
Popsey Kirsey
Dan
/82
/84     1,100
1,500
Seven Meadows
/82
/86     15,500
-0-
Misty Puff
/82
/86     10,200
-0-
Tom's Winter
/82
2/83     4,000
2,000
Hot Pot
/82
1/83     1,500
-0-
Grass Catcher
/82
1/83     2,500
-0-
Away Magic
4/81
/85     foal -0-
G. T. Bullet
1/83
7/83     17,500
30,000
Buku Bucs (1/2)
2/83
9/83     5,250
1,500
Madam T (1/2)
3/83
84 or 85  foal -0-
Iris L (1/2)
/83
/84     2,500
375
Ideal Dixie
/83
/84     1,250
750
Just Jolly
/83
/84     7,000
1,000
Scotch Penny
/83
/86     3,500
-0-
Miguelito
/83
/84     12,000
3,000
Fireball Rock
/83
/85     18,750
14,000
L. J. Rob (1/2)
/83
/85     2,500
3,500
L. J. Daisy
/83
still owns
12,000
Ma Ma's
Messenger
11/83
11/84     5,000
2,000
Chicago Bull (1/2)
/83
/86      2,500
-0-
Peppy's Luck (1/2)
/83
/86      4,000
2,000
Say Your Sorry
5/82
/85      foal
-0-
I Gas Em
5/82
/86      foal
-0-
Chicago's Pride
/84
/87      4,000
4,000
Maria Patron
/84
/86      18,900
7,000
Swift Sam
9/84
still owns
7,000
Rolles (1/2)
/84
2/86     3,750
3,500
Rum Dancer (1/2)
/84
still owns
1,500
G. T. Bullet (1/2)
/84
/85     [11] 7,000
5,000
Pinkafeld
11/85
2/86     10,000
12,500
Lima Silver
12/85
/87     15,000
[12] -0-
Marsha R
5/84
still owns
foal Chicago Honey
4/84
still owns
foal Key Instructor
6/85
still owns
foal Fifi's Irish
Temper
/85
still owns
foal Miss Sunbury (1/2)
/86
still owns
4,000
Rambling Road N
2/86
still owns
12,000
Alvern Rainbow
5/86
/87     20,000
[13] -0-
Super Stock
/87
still owns
8,000
A Different
Touch
/83
/84     foal -0-
*143 *144 Footnotes
1. Section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. Rule references are to this Court's Rules of Practice and Procedure.↩
2. Apparently, time demands are not as great upon anesthesiologists as other doctors because the surgeon or other doctors are primarily responsible for the patient and there is less need for post-operative follow-up.↩
3. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
1. A "(1/2)" after the name of the horse indicates that petitioner has a one-half interest in the horse. ↩
2. Date indicated is the date foaled for horses where petitioner owned the brood mare at the time of foaling. ↩
3. For horses given away rather than sold, the date listed is the date the horse was transferred away from petitioner's care, control and responsibility for feeding and stabling. ↩
4. The word "foal" indicates petitioner owned the brood mare at time of foaling. Where one-half ownership is indicated in column one, the cost and sale price listed is limited to petitioner's percentage. ↩
5. In approximately 1976, Truella Time was retired from racing and used as a brood mare. Truella Time was kept at Flannery Stables in Illinois and dropped one foal while still one-half owned by petitioner; however, the foal was given away prior to naming. Approximately 1979 or 1980, Dr. Lambert, the co-owner, took over full ownership and all responsibility for expenses from thereon out. ↩
6. Petitioner raced Jib Harry until 1981 and then gave him away sometime between 1981 and 1983. ↩
7. Nu Miss Magic never raced. Nu Miss Magic was purchased to be a race horse but was used as a brood mare. Nu Miss Magic's foals were Away Magic, Miss Roman Nose, Marsha R and Key Instructor. In 1985 Nu Miss Magic was given away. ↩
8. Died ↩
9. Foal arrived after petitioner gave away his interest in the brood mare. ↩
10. Repurchased ↩
11. Repurchased ↩
12. died ↩
13. died↩